STATE OF NORTH CAROLINA v. TIMOTHY LANIER ALLEN

No. 70A86

(Filed 6 October 1988)

**1. Criminal Law § 75.4— confession—initiation of communication by defendant—request for attorney—admissible**

The trial court did not err in a prosecution for the murder of a highway patrolman by admitting defendant's statement to officers made after defendant told the officers he wanted a lawyer where the officers did not ask any further questions of defendant after he requested counsel; one officer told defendant that all he wanted was the truth, that defendant would be returned to his jail cell, and that there would be no further interview with him; the officer also told defendant that if he wished to have a further conversation, he should call an officer; another officer suggested that defendant should ask for the first officer if he called for an officer; and defendant then indicated that he wanted to talk. There was no coercion or pressure, nor was there any "functional equivalent" to questioning, and the fact that defendant was to be handcuffed to be returned to his jail cell was not a continuation of the interrogation.

**2. Criminal Law § 75.10— confession—totality of circumstances surrounding interrogation—admissible**

The trial court did not err in admitting defendant's statement to officers in a prosecution for first degree murder despite a massive show of force at the time of defendant's capture, the fact that he was kept handcuffed in an isolated cell for several hours before interrogation, the crowding of the jail with law enforcement officers, the failure of officers to assist defendant when he requested counsel, and the defendant's mental and physical condition at the time of his capture as a result of lack of sleep, being pursued by bloodhounds and helicopters for two or three hours, and illness from drug withdrawal. None of those factors necessarily prevented the defendant's waiver of rights from being the product of a free and deliberate choice.

**3. Criminal Law § 75.1— confession—unnecessary delay in seeing magistrate—admissible**

Defendant's confession was admissible in a first degree murder prosecution despite some delay in taking defendant before a magistrate in violation of N.C.G.S. § 15A-501 because there was nothing in the record showing that defendant's confession resulted from any delay.

**4. Constitutional Law § 60; Jury § 7.14— peremptory challenges of black jurors—no error**

The defendant in a first degree murder prosecution did not make a prima facie showing of racially motivated peremptory challenges to black jurors where the State accepted seven of the seventeen black veniremen tendered and the majority of the jury which tried the defendant was black.

**5. Jury § 7.12— first degree murder—challenge to veniremen for cause—opposition to death penalty**

The trial court did not err in a first degree murder prosecution by excusing a juror for cause based on her opposition to the death penalty where it was clear from answers given by the juror to the prosecutor, defense counsel and the court that she was irrevocably committed not to vote for the death penalty.

**6. Jury § 7.14— first degree murder—qualms about death penalty—use of peremptory challenges—no error**

The prosecutor's use of peremptory challenges in a first degree murder prosecution to excuse veniremen who had qualms about the death penalty but who were not excludable pursuant to *Witherspoon v. Illinois*, 391 U.S. 510, did not violate the Eighth and Fourteenth Amendments to the U.S. Constitution or Art. I, §§ 19 and 24 of the North Carolina Constitution.

**7. Constitutional Law § 66— first degree murder—examination of jury out of presence of defendant—no error**

There was no prejudice in a prosecution for the murder of a highway patrolman from the trial court's examination of each juror in chambers with only a court reporter present following a weekend television broadcast concerning the trial where an alternate juror told the judge that her husband had been in an automobile accident, that she had driven to the scene to pick him up, that her husband had told the highway patrolman at the accident scene not to talk to her because she was on the jury, and that she had been very cautious at the scene of the accident not to talk to the patrolman. It is clear that the juror had no real contact with the patrolman, and the defendant did not show nor could the Court think of facts which would shed additional light on the question of the influence of the patrolman on the juror.

**8. Jury § 9— first degree murder— replacement of juror with alternate—no abuse of discretion**

The trial court did not abuse its discretion in a first degree murder prosecution where it was discovered that one juror had heard the case discussed by her fellow workers and the court excused the juror and replaced her with an alternate.

**9. Homicide § 15— first degree murder—widow's feelings when she heard of shooting—no prejudice**

The defendant in a prosecution for the murder of a highway patrolman could not have been prejudiced by the admission of testimony by the patrolman's widow that she was hurt, mad, and disgusted when she heard that her husband had been killed because any juror would know without this testimony that the widow would be at least hurt, mad and disgusted.

**10. Criminal Law §§ 45.1, 42.4— murder weapon—passed among jury and tested—no error**

There was no error in a first degree murder prosecution in allowing the pistol identified as the murder weapon to be passed among the jury and tested by the jury as to its pull where the evidence was more in the nature of a demonstration than an experiment and was governed by N.C.G.S. § 8C-1, Rule 403.

**11. Criminal Law § 102.6— murder—argument that defendant hiding behind Constitution—no error**

The trial court did not err in a first degree murder prosecution by not intervening *ex mero motu* when the prosecution argued that defendant was hiding behind the Constitution with regard to his confession but that the judge had ruled it admissible and that it was for the jury to decide if it was true. A general comment about constitutional rights does not rise to the level of gross impropriety requiring intervention by the court.

**12. Criminal Law § 102.6— murder—argument concerning confession—no error**

The trial court did not err by not intervening *ex mero motu* in a prosecution for first degree murder where the assistant district attorney argued that defendant had first indicated that he wanted a lawyer as a feeler to see how officers would react before he confessed where the manner in which the defendant relayed his request for an attorney could give rise to the inference for which the State argued.

**13. Criminal Law § 102.6— murder—closing argument—comment on conflicting testimony**

There was a sufficient conflict in the testimony in a first degree murder prosecution for the assistant district attorney to argue that, to believe defendant, the jury would have to believe that the officers were lying; arguing that a jury should believe one witness rather than another does not shift the burden of proof.

**14. Criminal Law § 102.6— murder—closing argument—comment on other participants not testifying—no error**

The trial court did not err by not intervening *ex mero motu* in the closing arguments of a murder prosecution where the district attorney argued to the jury that others involved in the incident with defendant had not testified because they would not survive in prison if they had testified against defendant.

**15. Criminal Law § 135.8— murder—aggravating factor—victim a law enforcement officer—argument calling attention to aggravating factor—no error**

It was not improper for the district attorney in a prosecution for the murder of a highway patrolman to argue that the jury should consider the bravery of law enforcement officers who captured defendant before he could go into the jurors' homes or rob or hurt someone; that the widow of the deceased highway patrolman had done her painful duty by coming to court each day to see that justice was done; that law enforcement officers across the state expected the jury to do its duty; and that unless the jury did its duty by recommending death, the jurors would be telling law enforcement officers that their lives and services were without value. One of the aggravating circumstances to be considered was that the person killed was a law enforcement officer in the performance of his duty and the argument was proper to focus attention on this factor. N.C.G.S. § 15A-2000(e)(8) (1988).

**16. Criminal Law § 135.8— murder—aggravating factors—argument that factors approved by Supreme Court—no error**

There was no error in a first degree murder prosecution from the district attorney's argument that the General Assembly had adopted the aggravating

factors, that the Supreme Court had held that they were proper, and that it was for the jury to determine their existence.

**17. Criminal Law § 135.9— murder—mitigating factor of impaired capacity—not submitted—no error**

The trial court did not err in a prosecution for first degree murder by not submitting the statutory factor of impaired capacity to appreciate the criminality of conduct where defendant may have taken a drug several hours before the shooting or may have drunk some beer. N.C.G.S. § 15A-2000(f)(6).

**18. Criminal Law § 135.9— murder—mitigating circumstances—instruction that unanimity required—no error**

The trial court did not err in a first degree murder prosecution by charging the jury that they must be unanimous before they could find a mitigating circumstance to exist.

**19. Criminal Law § 135.7; Homicide § 12; Criminal Law § 135.8— murder—review of prior opinions—declined**

The Supreme Court declined to overrule its prior cases on whether there was error in a first degree murder prosecution because defendant was not allowed to inform the jury that if they did not reach a unanimous verdict, the defendant would be sentenced to life in prison; defendant was denied a bill of particulars as to what aggravating circumstances would be submitted to the jury; and the court submitted as aggravating factors both that the murder was committed to avoid arrest and that the murder was committed against a law enforcement officer in the performance of his duties.

**20. Criminal Law § 135.10— murder—death sentence—not disproportionate**

The death sentence was not disproportionate for the murder of a highway patrolman where the killing was cold-blooded, unprovoked and unjustified; the defendant, although not required to do so, stopped behind a highway patrolman, took a pistol from his van as the trooper reached over in a defenseless position, and shot the trooper point blank three times resulting in the victim drowning in his blood; and defendant exhibited a course of conduct that was without regard for the law or its enforcement, culminating in the murder of a law enforcement officer while in the line of duty and motivated by desire to avoid or prevent an arrest.

Chief Justice EXUM dissenting as to sentence.

Justice FRYE joins in this dissenting opinion.

APPEAL by defendant from a death sentence imposed by *Pope, J.,* at the 4 November 1985 Criminal Session of Superior Court, HALIFAX County. The defendant's motion to bypass the Court of Appeals was allowed in those cases in which sentences of less than life were imposed. Heard in the Supreme Court 11 April 1988 and 22 August 1988.

State v. Allen

The defendant was tried and convicted on three counts of felony possession of stolen property and one count of first degree murder for the killing of Raymond E. Worley, a member of the North Carolina State Highway Patrol. Evidence presented at trial tended to show the following: During the early morning hours of 14 May 1985, Mr. Worley was patrolling I-95 in Halifax and Northampton counties. At approximately 5:11 a.m. Mr. Worley radioed his dispatcher that he was stopping two vans with Maryland license tags just north of Highway 561. No further radio communication from Mr. Worley was received. A short time later, pursuant to a request from the dispatcher at the Enfield Police Department, Don Davenport, a Division of Motor Vehicles enforcement officer, attempted to locate Mr. Worley. Davenport and Officer Cecil Austin drove approximately twelve miles up I-95 where they spotted Mr. Worley's car sitting on the right hand side of the road near highway marker 163. They also observed a white van parked in front of the patrol car. As they pulled up behind the patrol car, they noticed Mr. Worley sitting in the driver's seat and that the rear window was slightly fogged. The officers got out of their vehicles and approached the patrol car at which time they saw that the driver's side window of the car was shattered, and that Mr. Worley's body was leaning to the right with his head tilted downward. Blood covered Worley's shirt and was spattered across the right side of his head as well as on his right arm and leg. The officers checked for a pulse but there was none. Rescue vehicles were called and arrived on the scene shortly thereafter at which time Mr. Worley was pronounced dead. A crime scene investigation was begun, with photographs and fingerprints being taken. In addition, investigators found a .22 caliber pistol as well as an identification card of a black male, Antonio Worrell.

An autopsy revealed that Mr. Worley had suffered three gunshot wounds. One shot entered behind the right ear and traveled through the neck, finally lodging in the left back behind the armpit. Another bullet entered the right shoulder and lodged near the right base of the neck. A third bullet hit the middle finger of the left hand.

Dr. John Butts, Associate Chief Medical Examiner for Halifax County, testified that due to massive blood loss Mr. Worley probably lost consciousness within a minute and died three to four

minutes after the shooting. Dr. Butts further testified that Mr. Worley's lungs were hyperinflated due to blood rushing into the airways, essentially drowning him in his own blood. The bullets found in the body were those of a .38 caliber pistol, which were subsequently compared with the gun found on Alex Allen.

At approximately 6:02 a.m. on 14 May 1985, Sergeant Everett Horton, of the North Carolina State Highway Patrol, received a call about Mr. Worley. He immediately began organizing a manhunt and alerted law enforcement officials from the surrounding counties.

The authorities subsequently received a report of an abandoned black van near the intersection of Highway 903 and U.S. 301 and a man walking down U.S. 301 near where the van had been abandoned. Around 6:20 a.m., E. D. Marshman, a member of the Highway Patrol, left his home off Highway 301 and began listening to radio accounts of the murder. He then observed a man matching the description of the man seen leaving the van walking along the highway. Marshman pulled up behind the man, subsequently identified as co-defendant Alex Allen, and ordered him to lie on the ground where he handcuffed him and placed him in custody. A subsequent search of Alex Allen revealed a .38 caliber pistol.

Around 7:15 a.m. on 14 May 1985, law enforcement officers tracked a group of three men to an abandoned house where they were arrested and taken into custody. The three were subsequently identified as Antonio Worrell, Mack Greene, and the defendant, Timothy Allen.

The co-defendants were transported back to the Halifax County Sheriff's Department. After interrogating defendants Worrell, Greene, and Alex Allen, E. C. Warren, a detective with the Halifax County Sheriff's Department, began interrogating the defendant, Timothy Lanier Allen. At 1:50 p.m., the defendant was brought into an interview room where his Miranda rights were read to him, after which a waiver was obtained and interrogation begun. The defendant ultimately confessed to the murder.

In his confession, the defendant stated that on 11 May 1985 he left Washington, D.C. with Alex Allen, Antonio Worrell and Mack Greene in a black van stolen in Maryland. They traveled to

Wallace, North Carolina, where they stayed with friends until around midnight on 13 May 1985. At that time they made plans to return to Washington, D.C. On the way they broke into a store located near Ivanhoe on N.C. 421 in Pender County, stealing beer, cigarettes and .22 and .38 caliber pistols. The defendant kept the .38 pistol and gave the .22 pistol to co-defendant Worrell and they continued their trip, stopping again along the road to steal a white van from a car lot. The defendant and Alex Allen got into the white van and followed Worrell and Greene in the black van.

As the group proceeded toward Washington, a patrol car pulled around the van driven by the defendant and stopped the van driven by Worrell. At that time the defendant pulled his van in behind the patrol car and parked on the shoulder of the highway. The defendant stated that he observed Mr. Worley get out of the patrol car, speak to Worrell, and then Worrell follow the trooper back to the patrol car. Mr. Worley then motioned for the defendant to get out of the van and come to the patrol vehicle. As the defendant approached the car, Mr. Worley reached over to unlock the door. At that time, the defendant fired at least twice at Mr. Worley. At that point, all the co-defendants fled the scene in the black van and were subsequently arrested after hiding near an abandoned house.

After giving his statement, the defendant read the written version and signed the statement as being the truth to the best of his knowledge and belief. This statement was introduced by the State and read into evidence at trial.

At the close of the State's evidence, the defendant took the stand and denied shooting Mr. Worley, stating instead that following a meeting at the patrol car between himself, Worrell and Mr. Worley, he returned to the black van to get his license when he heard shots fired. After Mr. Worley was shot, the defendant and his friends drove off.

The jury found the defendant guilty of first degree murder and three counts of felonious possession of stolen property. After a sentencing hearing the jury recommended the death penalty which was imposed. The defendant appealed.

*Lacy H. Thornburg, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, H. Julian Philpott, Jr., Associate Attorney General, James J. Coman, Senior Deputy Attorney General, William N. Farrell, Jr., Special Deputy Attorney General, and Joan H. Byers, Special Deputy Attorney General, for the State.*

*Geoffrey C. Mangum and Glover & Petersen, by Ann B. Petersen, for defendant appellant.*

*E. Ann Christian and Robert E. Zaytoun, for North Carolina Academy of Trial Lawyers, amicus curiae.*

*John A. Dusenbury, Jr., for North Carolina Association of Black Lawyers, amicus curiae.*

WEBB, Justice.

By his first assignment of error the defendant contends that the trial court erred in refusing to grant his motion to suppress his confession made by him on the day of his arrest. The defendant advances three different arguments as to why his confession should have been suppressed. He says first, pursuant to *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378, *reh. denied*, 452 U.S. 973, 69 L.Ed. 2d 986 (1981), his in-custody statement should have been suppressed due to a failure to stop interrogating him when he invoked his right to counsel. He also says he was not taken before a magistrate without unnecessary delay as required by N.C. G.S. § 15A-501(2). The third reason the defendant advances as to why his confession should have been suppressed is that considering the totality of the circumstances the State did not show the confession was voluntary.

The defendant made a motion to suppress his confession and a hearing was had before trial. There was testimony at this hearing by William A. Thompson, a special agent of the State Bureau of Investigation, that he and E. C. Warren, a detective with the Halifax County Sheriff's Department, questioned the defendant in the interview room at the Sheriff's Department offices. The interview occurred at approximately 1:50 p.m. on 14 May 1985. Mr. Thompson testified that Mr. Warren read the defendant his constitutional rights to remain silent and to have an attorney. The defendant signed a written waiver of his constitutional rights and

Mr. Warren confronted the defendant with the evidence against him and attempted to interrogate him as to his part in the incident of that day. The defendant did not respond to Mr. Warren's questions until he was told of a statement by Antonio Worrell that the defendant had shot Mr. Worley. Mr. Thompson testified that at that point, "Timothy Allen stated something to the effect that if he made a statement that they would put him in the gas chamber — or the electric chair, is what he said." At this point the defendant said he wanted to talk to a lawyer. The two officers stopped questioning the defendant and Mr. Warren told the defendant all he wanted was the truth, that the defendant would be returned to his jail cell and there would be no further interview with him. Mr. Warren also told the defendant that if he wished to have a further conversation he should call an officer. At that point Mr. Thompson suggested that if the defendant called for an officer he should ask for Mr. Warren. At this point the defendant said, "okay." The defendant then said, "I want to talk to you now, man." Mr. Warren then took the defendant's statement in which the defendant confessed to shooting Mr. Worley.

The court found facts consistent with the above evidence and concluded the defendant initiated the contact with the officers that led to his confession, and that he knowingly, voluntarily and intelligently waived his right to remain silent and his right to counsel. The court ordered the confession admitted into evidence. The court's findings of fact are supported by the evidence and the findings of fact support the conclusions. We will not disturb them.

[1] In regard to the defendant's contention that the officers continued to interrogate him after he told them he wanted a lawyer, it is said in *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378:

> [A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.* (Emphasis added.)

*Id.* at 484-485, 68 L.Ed. 2d at 386. The defendant contends he did not initiate further communications after he asked for an attorney because the officers did not stop the interrogation. He says that Mr. Warren's statement that all he wanted was the truth, that

the defendant would be returned to his cell and would have to contact the officers if he wanted to make a statement was a continuation of the interrogation. He also says, that when his request for counsel was met by "handcuffs and incommunicado incarceration, while . . . inviting his last chance to tell his side of the story" he was cajoled into confessing.

We do not interpret the officers' statements as does the defendant. After he requested counsel the officers did not ask any further questions of the defendant. They told him of their availability if he changed his mind. We can find no coercion or pressure, nor was there any "functional equivalent" to questioning. *See Rhode Island v. Innis*, 446 U.S. 291, 64 L.Ed. 2d 297 (1980). The fact that the defendant was to be handcuffed to be returned to his jail cell is not a continuation of the interrogation. We believe the facts found by the superior court support the conclusion that the defendant of his own volition initiated the continuation of the interrogation.

For other cases in which we have held the defendant initiated contact with the officers after interrogation had been stopped, *see State v. Nations*, 319 N.C. 329, 354 S.E. 2d 516 (1987); *State v. Young*, 317 N.C. 396, 346 S.E. 2d 626 (1986); *State v. Williams*, 314 N.C. 337, 333 S.E. 2d 708 (1985); *State v. Baker*, 312 N.C. 34, 320 S.E. 2d 670 (1984).

[2] The defendant argues that even if he initiated further communications with the officers the totality of circumstances surrounding the interrogation shows the waiver of his right to counsel and his other constitutional rights was coerced and without the requisite level of comprehension. He says this is so because of the massive show of force at the time of his capture, the fact that he was kept handcuffed in an isolated cell for several hours before interrogation, the jail was crowded with law enforcement officers, the failure of the officers to assist him when he requested counsel, the defendant's mental and physical condition at the time of his capture as a result of lack of sleep, being pursued by bloodhounds and helicopters for two or three hours and illness from drug withdrawal.

None of these factors necessarily prevented the defendant's waiver of his rights from being the product of a free and deliberate choice rather than from intimidation, coercion or decep-

tion. Nor did they necessarily prevent the defendant from waiving these rights with a full awareness both of the nature of the rights being abandoned and the consequences of the decision to abandon them. The superior court so found and we are bound by its findings. *Moran v. Burbine,* 475 U.S. 412, 89 L.Ed. 2d 410 (1986).

[3] Finally, the defendant argues there was an unnecessary delay in violation of N.C.G.S. § 15A-501 before taking him before a magistrate. In *State v. Richardson,* 295 N.C. 309, 245 S.E. 2d 754 (1978), we held that a confession must be suppressed if there is a violation of N.C.G.S. § 15A-501 only if the confession was obtained as a result of the violation. In *Richardson* the delay in taking the defendant before a magistrate to advise him of his rights was substantially the same as in this case. We held this did not show the confession was obtained as a result of a violation of N.C.G.S. § 15A-501. There is nothing in the record in this case that shows the defendant's confession resulted from any delay in taking him before a magistrate.

The defendant's first assignment of error is overruled.

[4] In his second assignment of error the defendant contends he must have a new trial pursuant to *Batson v. Kentucky,* 476 U.S. 79, 90 L.Ed. 2d 69 (1986), because he was denied equal protection of the law as guaranteed by the Fourteenth Amendment to the Constitution of the United States and Article I, Section 26 of the Constitution of North Carolina. In *State v. Jackson,* 322 N.C. 251, 368 S.E. 2d 838 (1988), we faced a *Batson* question and said the following:

> In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69, the United States Supreme Court overruled *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed. 2d 759 (1965), and held a prima facie case of purposeful discrimination in the selection of a petit jury may be established on evidence concerning the prosecutor's exercise of peremptory challenges at the trial. In order to establish such a prima facie case the defendant must be a member of a cognizable racial group and he must show the prosecutor has used peremptory challenges to remove from the jury members of the defendant's race. The trial court must consider this fact as well as all relevant circumstances in determining whether a

prima facie case of discrimination has been created. When the trial court determines that a prima facie case has been made, the prosecution must articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group. The prosecutor's explanation need not rise to the level of justifying a challenge for cause. At this point the trial court must determine if the defendant has established purposeful discrimination. Since the trial court's findings will depend on credibility, a reviewing court should give those findings great deference. *Batson*, 476 U.S. 98, n. 21, 106 S.Ct. 1724, 90 L.Ed. 2d 89, n. 21.

*Id.* at 254-255, 368 S.E. 2d at 839-40.

In this case the jury before which the defendant was tried consisted of seven black persons and five white persons. Of the seventeen black veniremen tendered to the State (including alternates), it accepted seven or forty-one percent. In *State v. Abbott*, 320 N.C. 475, 358 S.E. 2d 365 (1987), we held that the defendant did not make a prima facie case of racially motivated peremptory challenges when the State peremptorily challenged three of five black veniremen tendered to it. In *State v. Belton*, 318 N.C. 141, 347 S.E. 2d 755 (1986), we held an inference that racially motivated peremptory challenges did not arise when the State peremptorily challenged six of the twelve black jurors tendered. In that case the State peremptorily challenged five white jurors. We hold pursuant to *Abbott* and *Belton* that the defendant has not made a prima facie showing of racially motivated peremptory challenges when the State accepted seven of the seventeen black veniremen tendered and the majority of the jury which tried the defendant was black.

[5] In his third assignment of error the defendant contends it was error to excuse a juror for cause based on her opposition to the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776, *reh'g denied*, 393 U.S. 898, 21 L.Ed. 2d 186 (1968), held that a venireman may be excused for cause if he is irrevocably committed before the trial begins to vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings. During the examination of one of

the jurors by the district attorney the following colloquy occurred:

> MR. BEARD: All right. And also because you are a nurse. Because of those things, it is your decision that you would not be able to recommend the death penalty in this particular case?

> MRS. ROOK: Yes, sir.

> MR. BEARD: We challenge for cause.

The defendant then was allowed to examine Mrs. Rook and the following occurred:

> MR. CHICHESTER: And if after you searched your heart and you went through the facts as you found them, and to pursuant to your duty as under, your—ah, you match these facts with the law that her Honor gives you. And you came up with death as an appropriate sentence. Would you be able to follow your oath and return a verdict of the death sentence?

> MRS. ROOK: No, sir.

The court then asked the following question:

> COURT: Is it your position that before the trial of this matter even begins, that you could not vote for the imposition of the death penalty? That is, the death sentence. No matter what the facts or circumstances may show?

> MRS. ROOK: No, ma'am.

> COURT: You could not do that?

> MRS. ROOK: No, ma'am.

> COURT: All right. Thank you. You may step down. That is for cause.

It is clear from the three answers Mrs. Rook gave that she was irrevocably committed not to vote for the death penalty. She was properly excused under *Witherspoon*.

The defendant contends that in *Wainwright v. Witt*, 469 U.S. 412, 83 L.Ed. 2d 841 (1985) and *Adams v. Texas*, 448 U.S. 38, 65 L.Ed. 2d 581 (1980), the United States Supreme Court clarified the law so that the test now is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Under this test the juror was properly excused. The defendant argues that the answer the juror gave the court was equivocal, that is that "it is unclear whether Mrs. Rook's '[n]o' answer was '[n]o' she would not under any circumstances vote for the imposition of the death penalty or '[n]o' it is not her position that she would not vote for the death penalty no matter what the facts or the circumstances were." We believe it is clear from the three answers given by Mrs. Rook that she was irrevocably committed not to vote for the death penalty.

[6] In his fourth assignment of error the defendant contends that the State's use of peremptory challenges to remove jurors who were not disqualified under *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776, but who wavered in their ability to impose the death penalty violated his constitutional rights. The defendant contends the Eighth Amendment proscription of cruel and unusual punishment and the Fourteenth Amendment's due process clause require that the defendant have a jury that is not stacked against him. He says that allowing peremptory challenges to such veniremen results in a jury that does not reflect a cross section of the community and violates his rights under the United States Constitution. The defendant relies on *Batson v. Kentucky*, 476 U.S. 79, 90 L.Ed. 2d 69, and *Gray v. Mississippi*, 481 U.S. ---, 95 L.Ed. 2d 622 (1987), to support this argument.

Neither *Batson* nor *Gray* dealt with the prosecution's use of peremptory challenges to jurors who were not disqualified under *Witherspoon*, but who wavered in their ability to impose the death penalty. *Batson* dealt with peremptory challenges used in a racially discriminatory manner. It does not preclude the use of peremptory challenges in any other context. *Gray* dealt with the erroneous allowance of a challenge for cause. The Court recognized that prosecutors often exercise peremptory challenges to excuse jurors who are hesitant in voting for the death penalty but may not be challenged pursuant to *Witherspoon* and the courts do not review this reason for exercising a peremptory

challenge. *Gray v. Mississippi*, 481 U.S. ---, 95 L.Ed. 2d 622. In *State v. Robbins*, 319 N.C. 465, 356 S.E. 2d 279 (1987), we said the prosecution can take into account concerns expressed about capital punishment when exercising peremptory challenges. *Id.* at 494, 356 S.E. 2d at 297. We hold it was not error under the Constitution of the United States for the prosecution to use its peremptory challenges to excuse veniremen who had qualms about the death penalty but were not excludable pursuant to *Witherspoon*.

The defendant argues further that if we hold it did not conflict with the United States Constitution for the State to use peremptory challenges to strike veniremen with qualms about the death penalty, it nevertheless violates Article I, Sections 19 and 24 of the Constitution of North Carolina. We hold that for the same reasons this does not violate the United States Constitution, it does not violate the North Carolina Constitution.

[7] The defendant next assigns error to what he contends was the deprivation of his right to be present at every stage of the trial. During a weekend while the trial was in progress a television station broadcast a news report in which it was said that Mr. Worley's widow did not care or did not want the death penalty imposed on the defendant. In order to be certain the jury was not tainted by this television broadcast the court examined each of the jurors and alternates in her chambers with only a court reporter present. Following the examination of each of the jurors the court reported to the parties what was said. A transcript of the proceedings was made available to the parties. One of the alternate jurors told the judge that her husband had been in an automobile accident and she had driven to the scene to pick him up. She said her husband told the highway patrolman at the accident scene not to talk to her because she was on the jury. She said she was very cautious at the scene of the accident not to talk to the patrolman.

The defendant, relying on *State v. Payne*, 320 N.C. 138, 357 S.E. 2d 612 (1987), argues that his constitutional right to be present at every stage of the proceeding was violated. He says the State cannot show this was harmless error because there is no way of telling what information he could have obtained from the juror as to her contact with the patrolman had his attorney been present when she was examined by the court in chambers. This

juror told the court that during a recess in the trial she drove to the scene of an automobile accident in which her husband had been involved. Her husband told the highway patrolman at the scene not to speak to his wife because she was on the jury. She said she was careful not to speak to the patrolman at the scene. The defendant has not shown us and we can think of no facts which would shed additional light on the question of the influence of the patrolman on the juror. It is clear that the juror had no real contact with the patrolman. We hold that any error which may have been committed by the court was harmless beyond a reasonable doubt. *State v. Taylor*, 280 N.C. 273, 185 S.E. 2d 677 (1972). *See* N.C.G.S. § 15A-1443(b) (1983).

[8] In his sixth assignment of error the defendant argues it was error to remove one of the jurors during the trial and replace her with an alternate juror. When the court was examining the jurors as to whether they had seen the television program about the trial, it was discovered that a Mrs. Johnson who was on the jury had heard the case discussed by her fellow workers. She had worked at Stephens Textiles for three years and four months and worked on one weekend during the trial. While she was working that weekend, she took a break with approximately seven of her co-workers. She viewed them as her "working partners." During the break two people discussed the case in her presence for ten to fifteen minutes. The discussion was about the trial in general. One of the persons said she did not think the defendant could get a fair trial in Halifax County. After this was said Mrs. Johnson left the room. Mrs. Johnson had been instructed by the court not to discuss the case with anyone or to let the case be discussed in her presence. Based on this information the court excused Mrs. Johnson and replaced her with the alternate who had picked up her husband after he had an accident.

In *State v. Nelson*, 298 N.C. 573, 260 S.E. 2d 629 (1979), it was obvious on a Friday that the case could not be completed that day. The court asked the jury if they could continue on Saturday and one member of the jury said she could not. The court then removed that juror and substituted an alternate. In holding there was no error we said:

The trial judge has broad discretion in supervising the selection of the jury to the end that both the state and defendant

> may receive a fair trial. . . . This discretionary power to
> regulate the composition of the jury continues beyond empan-
> elment. . . . These kinds of decisions relating to the com-
> petency and service of jurors are not reviewable on appeal
> absent a showing of abuse of discretion, or some imputed
> legal error. (Citations omitted.)

*Id.* at 593, 260 S.E. 2d at 644. If it was not an abuse of discretion
to remove a juror in *Nelson* in order to keep the trial from going
into the next week, then it was not an abuse of discretion here to
remove a juror who had heard other people discuss the case; and
we so hold. *See also State v. Holden,* 321 N.C. 125, 362 S.E. 2d 513
(1987), *cert. denied,* --- U.S. ---, 100 L.Ed. 2d 935 (1988) and
*State v. Barts,* 316 N.C. 666, 343 S.E. 2d 828 (1986).

[9]  In his seventh assignment of error the defendant argues it
was error to allow Mr. Worley's widow to testify as to her feel-
ings when she heard of the shooting. During Mrs. Worley's testi-
mony the prosecuting attorney asked her how she felt when she
heard her husband had been killed. Over the defendant's objec-
tion Mrs. Worley testified, "I was hurt and I was mad; disgusted."
The defendant argues that this evidence was irrelevant on any
issue in the case and its sole tendency was to inflame the jury on
both the guilt and penalty phase of the trial. The defendant cites
*Booth v. Maryland,* 482 U.S. ---, 96 L.Ed. 2d 440 (1987), for the
proposition that the emotional impact on the family may not be
considered in the penalty phase of a capital case. We hold that if
this testimony was admitted in error it was harmless beyond a
reasonable doubt. It is hard to believe any juror would not know
without this testimony that Mr. Worley's wife would be at least
hurt, mad and disgusted when she heard he had been killed. The
defendant could not have been prejudiced by the admission of this
evidence.

[10]  In his eighth assignment of error the defendant contends it
was error to allow a .38 caliber pistol to be passed among the
jury and tested by the members of the jury as to its pull for
single and double action. The pistol had been identified as the
weapon with which Mr. Worley was shot and it was introduced
into evidence. We are bound by *State v. Walden,* 311 N.C. 667,
319 S.E. 2d 577 (1984), to overrule this assignment of error. In
*Walden* a shotgun was introduced into evidence and the court in-

structed the jury as follows: "[y]ou may look at the weapon, if you like, and use the hammer to cock it, if you desire." *Id.* at 675, 319 S.E. 2d at 582. In finding no error we said, "[w]e can see no reason why a prosecutor should not be allowed to suggest to a jury how it should examine real evidence, so long as he does not give his opinion as to the proof of a fact or state facts not in evidence." *Id.* at 676, 319 S.E. 2d at 583.

The defendant, relying on *State v. Mayhand*, 298 N.C. 418, 259 S.E. 2d 231 (1979); *State v. Hunt*, 80 N.C. App. 190, 341 S.E. 2d 350 (1986); and *State v. Graham*, 38 N.C. App. 86, 247 S.E. 2d 300 (1978), argues that the conditions under which the jury was allowed to experiment with the weapon were different from the conditions under which the pistol was allegedly fired on the road-side. In *Mayhand* we found no reversible error in allowing a prosecuting witness to sit in the lap of an officer to demonstrate the position she was in when she was raped. In *Graham* the Court of Appeals ordered a new trial when a prosecutor put a shirt, worn by the defendant at the time of the alleged shooting, in front of a defendant and directed him to cut the shirt with a knife. In *Hunt* the Court of Appeals found no error when a police officer, who testified he was not an expert, was allowed to demonstrate the operation of the weapon allegedly used in an assault and give his opinion that the gun would not fire unless the hammer was cocked and the trigger pulled.

In *Hunt*, Judge Becton, writing for the panel, made a distinction between a demonstration and an experiment. He defined a demonstration as "an illustration or explanation, as of a theory or product, by exemplification or practical application." He defined an experiment as "a test made to demonstrate a known truth, to examine the validity of a hypothesis, or to determine the efficacy of something previously untried." *Hunt*, 80 N.C. App. at 193, 341 S.E. 2d at 353. We believe the evidence challenged by this assignment of error is more in the nature of a demonstration than an experiment. We agree with Judge Becton that the test of the admissibility is as set forth in N.C.G.S. § 8C-1, Rule 403. If the evidence is relevant it will be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury.

[11]  The defendant next argues that the court committed reversible error by not intervening *ex mero motu* to stop certain argu-

ments by the prosecution to the jury at the guilt phase of the trial. Ordinarily, objection to the prosecutor's jury argument must be made prior to the verdict in order for the alleged impropriety to be reversible on appeal. *State v. Brock,* 305 N.C. 532, 290 S.E. 2d 566 (1982). In the absence of such objection, we will review the prosecutor's argument to determine only whether it was so grossly improper that the trial court abused its discretion in failing to intervene *ex mero motu* to correct the error. We have said:

> "We have consistently held that counsel must be allowed wide latitude in the argument of hotly contested cases. He may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his side of the case. Whether counsel abuses this privilege is a matter ordinarily left to the sound discretion of the trial judge, and we will not review the exercise of this discretion unless there be such gross impropriety in the argument as would be likely to influence the verdict of the jury. Even so, counsel may not employ his argument as a device to place before the jury incompetent and prejudicial matter by expressing his own knowledge, beliefs and opinions not supported by the evidence[.] It is the duty of the trial judge, upon objection, to censor remarks not warranted by the evidence . . . and, in cases of gross impropriety, the court may properly intervene, *ex mero motu*." (Citations omitted.)

*State v. Williams,* 314 N.C. 337, 358, 333 S.E. 2d 708, 722 (1985) (quoting *State v. Covington,* 290 N.C. 313, 327-28, 226 S.E. 2d 629, 640 (1976) ).

*State v. Jones,* 317 N.C. 487, 500-01, 346 S.E. 2d 657, 664-65 (1986).

The assistant district attorney appearing in this case argued:

He will hide behind the Constitution of this country that protects all of us. Not just selected ones of us, but all of us. But it's not something for a criminal to hide behind.

The Constitution of this land has been complied with. The judge has ruled on the admissibility of the confession, and it has come before you. The only thing left for you to decide right now is was it true.

The defendant argues that the prosecution invited the jury to disapprove of the defendant for relying on his constitutional rights. He says the State is not allowed to obtain a conviction by punishing a defendant for relying on his constitutional rights. The defendant relies on *Doyle v. Ohio*, 426 U.S. 610, 49 L.Ed. 2d 91 (1976), which holds that the defendant's silence after receiving Miranda warnings cannot be used against him, and *Griffin v. California*, 380 U.S. 609, 14 L.Ed. 2d 106 (1965), which holds the State cannot comment on the defendant's failure to testify. *Doyle* and *Griffin* deal with a specific constitutional right which would be infringed if comments are made about it. A general comment about constitutional rights as was made in this case does not rise to the same level. It is certainly not such a gross impropriety that the court should have intervened *ex mero motu*.

[12]  The defendant next says that by arguing that the judge had ruled upon the admissibility of the confession the assistant district attorney argued that the judge had held the confession was valid and the jury should accept this ruling as to the validity of the confession. When the defendant challenged the confession the judge had to rule on its admissibility. When she ruled it was admissible the jury then had to pass on its truthfulness. This is what the assistant district attorney told the jury and it was not error for the court not to intervene.

The assistant district attorney also argued:

[The defendant] was looking [out for] himself [by minimizing his culpability], the same as he had been when he went in there and said, "Well, I think maybe I need a lawyer." That was a feeler. That was, that was for number one, you put it out there and see how [the officers] react. Are they going to deal with me on this?

The defendant argues that the right to counsel was a constitutional right and the prosecution may not be allowed to characterize it as something nefarious. The manner in which the defendant delayed his request for an attorney could give rise to the inference for which the State argued. It was not error for the court not to intervene *ex mero motu*.

[13]  At one point the assistant district attorney argued, "[y]ou have to believe now, that this man is telling you the truth and

these officers are the ones who made it all up." The defendant first argues that this shifts the burden of proof to the defendant because the prosecutor told the jury they would have to find the defendant guilty unless the defendant proved the officers were lying. He also says that it was not his contention that he did not tell the officers he shot Mr. Worley but that he had not been truthful when he told them he had done so. In many cases the outcome of a case depends on which of the witnesses is to be believed. It does not shift the burden of proof for an attorney to argue to a jury that it should believe one witness rather than another. There was sufficient conflict in the testimony for the assistant district attorney to argue as she did.

[14] The district attorney argued to the jury that the defendant's attorney had commented on the fact that the others involved in the incident with the defendant had not testified. The district attorney then told the jury that they would not survive in prison if they had testified against the defendant. The defendant contends the most likely reason they did not so testify was that they were afraid of implicating themselves and under no circumstances should the prosecutor have speculated on this matter which was not in evidence. The inference which the district attorney made was not so unreasonable that the court should have intervened *ex mero motu* and stopped the argument.

The defendant's ninth assignment of error is overruled.

[15] In the tenth assignment of error the defendant argues it was improper for the district attorney to argue that the jury should consider the bravery of the law enforcement officers who captured the defendant before he could go into the jurors' homes or rob or hurt someone, that the widow of the deceased highway patrolman had done her painful duty by coming to court each day to see that justice was done, that the law enforcement officers across the state expected the jury to do its duty, and that unless the jury did its duty by recommending death, the jurors would be telling law enforcement officers that their lives and services were without value. One of the aggravating circumstances to be considered in determining whether to impose the death penalty is that the person killed was a law enforcement officer in the performance of his official duty. N.C.G.S. § 15A-2000(e)(8) (1983). This argument was proper to focus the jurors' attention on this aggra-

vating factor. It is not, as argued by the defendant, an appeal to the jury to impose the death penalty because that is what is desired by the public, an argument which we held to be improper in *State v. Scott*, 314 N.C. 309, 333 S.E. 2d 296 (1985).

[16] The district attorney argued at one point:

> First of all, the State has to prove the existence of some aggravating circumstances. Now, the aggravating circumstances that the State can submit to you are set out by statute. They were set out by the Legislature and they've been approved by the Supreme Court. These aggravating circumstances that will be submitted to you have already been set out in the statute but what you have to decide is whether . . . these aggravating circumstances exist in this case. I'm confident that you will find that two aggravating circumstances do exist and two aggravating circumstances are all that will . . . be submitted to you.

The defendant argues that because the district attorney said the two aggravating factors had "been approved by the Supreme Court," it conveyed to the jury the idea that the Supreme Court commended these aggravating factors to the jury. When read in context we believe this is not the reasonable interpretation. The district attorney told the jury the General Assembly had adopted these aggravating factors and this Court has held they are proper aggravating circumstances. It is the jury, however, which must determine whether they exist. We do not think this argument misled the jury regarding the manner in which it was to consider this aggravating circumstance.

This assignment of error is overruled.

[17] In his eleventh assignment of error the defendant contends the court should have submitted to the jury the statutory mitigating circumstance set forth in N.C.G.S. § 15A-2000(f)(6), that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. We dealt with this mitigating circumstance in *State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979). We said impaired mental capacity would exist "if the defendant's capacity to appreciate (to fully comprehend or be fully sensible of) the criminality (wrongfulness) of his conduct was impaired (lessened or

diminished), or if defendant's capacity to follow the law and refrain from engaging in the illegal conduct was likewise impaired (lessened or diminished)." *Id.* at 68, 257 S.E. 2d at 613.

The defendant contends there was sufficient evidence of his impaired mental capacity to submit this mitigating factor to the jury. He says the evidence shows he was a heroin user and had taken a drug three or four hours before the shooting. There were beer cans found in the van in which the defendant was riding. Mr. Thompson testified that during the interrogation, the defendant said he had taken drugs the day before the shooting and "felt bad," although he was not experiencing withdrawal symptoms. The defendant testified he told Mr. Thompson that "he was experiencing withdrawal symptoms, was sick and requested a doctor." A Dr. Brown was called to the jail because the defendant had vomited and may have had withdrawal problems. Dr. Brown testified that when he saw the defendant he did not notice any withdrawal symptoms but prescribed some medicine for heroin withdrawal. The defendant testified when asked if he was suffering withdrawal symptoms from heroin use, "[m]aybe at that particular moment, no, sir, but I have been feeling bad so I knew later on that I would be withdrawing, yes, sir." There was no expert testimony as to the defendant's diminished capacity.

The fact that defendant may have taken a drug several hours before the shooting or that he may have drunk some beer is not sufficient alone to show a diminished capacity to appreciate the criminality of the offense or to refrain from illegal conduct. *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). The defendant has shown no more than this. It was not error not to submit this mitigating circumstance to the jury.

[18] The defendant next contends it was error for the court to charge the jury that they must be unanimous before they could find a mitigating circumstance to exist. The defendant bases this assignment of error on *Mills v. Maryland*, --- U.S. ---, 100 L.Ed. 2d 384 (1988), which dealt with the finding by a jury of mitigating circumstances in a capital case. Oral arguments in this case were heard prior to the date of the decision of the United States Supreme Court in *Mills*. As a result of that decision we ordered that new briefs be filed and additional oral arguments made in this case. For the reasons expressed in *State v. McKoy*, 323 N.C. 1,

372 S.E. 2d 12 (1988), we reject defendant's argument based on *Mills*.

[19]   The defendant also argues under separate assignments of error three issues which he recognizes have been determined against his position in previous cases. He asks that we find error because (1) he was not allowed to inform the jury that if they did not reach a unanimous verdict the defendant would be sentenced to life in prison, (2) he was denied a bill of particulars as to what aggravating circumstances would be submitted to the jury, and (3) the court submitted as aggravating factors that the murder was committed to avoid arrest and the murder was committed against a law enforcement officer in the performance of his duties. He contends these two aggravating factors are duplicative.

The defendant concedes this Court has rejected all three contentions in several cases including *State v. Smith*, 320 N.C. 404, 358 S.E. 2d 329 (1987) for his first contention, *State v. Young*, 312 N.C. 669, 325 S.E. 2d 181 (1985) for his second contention, and *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981) for his third contention. We decline to overrule any of these cases.

## PROPORTIONALITY REVIEW

[20]   Having determined there was no error in the guilt or penalty phase of the trial sufficient to require a new trial or sentencing hearing, we are required by N.C.G.S. § 15A-2000(d)(2) to determine (1) whether the record supports the jury's finding of the aggravating circumstance upon which the sentence of death was imposed, (2) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and (3) whether the sentence is excessive or disproportionate to the penalty imposed in the pool of similar cases, considering both the crime and the defendant.

We have thoroughly examined the record, transcripts, and briefs in this case. We find that the record clearly supports the submission of the aggravating circumstances considered and found by the jury. Further, we find no indication at all that the death penalty was imposed under the influence of passion, prejudice or arbitrary factors.

We turn then to our final statutory duty of proportionality review. In dealing with a review as to whether "the sentence of

death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant" in *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983), this Court said it would use a "pool" of cases which included:

> *[A]ll cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Id.* at 79, 301 S.E. 2d at 355. This pool includes only those cases which this Court has found to be error free in both phases of trial. *State v. Jackson*, 309 N.C. 26, 45, 305 S.E. 2d 703, 717 (1983).

In *State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984), *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267 (1985), we said that in comparing a case with those in the pool, we would limit our consideration to those cases "roughly similar with regard to the crime and the defendant." We also said:

> If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*Lawson*, 310 N.C. at 648, 314 S.E. 2d at 503.

With the magnitude and seriousness of our task in mind, we have reviewed the facts and circumstances of this case and compared them to other cases in the proportionality pool. The distinguishing features of the present case are: (1) it is the first degree murder of a law enforcement officer while engaged in the performance of his duty; (2) it is a case in which the motive for the murder was to avoid lawful arrest; (3) it is a case in which the murder was preceded by a violent course of conduct (i.e., multi-

state crime spree); and (4) it is a case in which the defendant appeared in control of his mental and physical faculties before, during, and after the killing and gave a knowing and voluntary confession thereto.

Our careful analysis of the pool reveals a total of seven cases in which a defendant was charged with the murder of a law enforcement officer. Those cases are *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988); *State v. Bray*, 321 N.C. 663, 365 S.E. 2d 571 (1988); *State v. Rios*, 322 N.C. 596, 369 S.E. 2d 576 (1988); *State v. Payne*, 312 N.C. 647, 325 S.E. 2d 205 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E. 2d 163 (1984); *State v. Abdullah*, 309 N.C. 63, 306 S.E. 2d 100 (1983); and *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981). Of these seven cases, in three, *Hutchins*, *Hill* and *McKoy*, did the jury recommend death.

In *State v. Hill*, 311 N.C. 465, 319 S.E. 2d 163, defendant was charged and convicted of the first degree murder of a Hendersonville police officer. Following the jury's recommendation and the trial court's sentence of death, this Court vacated the sentence holding it to be disproportionate pursuant to N.C.G.S. § 15A-2000 (d)(2). In support of this decision, the Court in *Hill* cited the speculative nature of the evidence surrounding the murder, not only as to the defendant's whereabouts at the time of the murder but also as to what he might have been doing just prior to his encounter with the officer. Likewise, the Court cited the lack of evidence as to who drew the murder weapon out of the officer's holster. The Court in *Hill* further focused its attention on the failure to submit N.C.G.S. § 15A-2000(e)(4) (that the murder "was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody") as an aggravating circumstance for the jury's consideration. Thus, given the speculative nature of the evidence surrounding the murder, the apparent lack of motive, and the short amount of time involved in the murder itself, the Court in *Hill* ordered the defendant sentenced to life imprisonment in lieu of the death sentence.

In contrast to the holding in *Hill*, this Court in *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788, affirmed the trial court's sentence of death. *Hutchins* involved the murder of three law enforcement officers, two of which were first degree murder convictions. The jury found three aggravating factors: (1) that the

murder was committed to avoid lawful arrest; (2) that the murder was committed against a law enforcement officer while engaged in the performance of his duties; and (3) the murder was part of a course of conduct involving crimes of violence. The Court further cited the clear evidence of guilt and the defendant's conduct and wanton disregard for the value of human life and for the enforcement of the law by duly appointed authorities.

As previously mentioned, defendant offered three other cases for our proportionality review as they relate to the case at bar: *State v. Abdullah*, 309 N.C. 63, 306 S.E. 2d 100, involved a conspiracy to commit an armed robbery by defendant and five other co-defendants. While defendants were committing the robbery, a law enforcement officer entered the store to make a purchase whereupon he was shot several times and left to die. Although finding four aggravating factors ( (1) defendant had previous convictions of violent crimes, (2) the murder was committed to avoid arrest, (3) the murder was committed while engaged in an armed robbery, and (4) the murder was committed against a law enforcement officer while in the line of duty), the jury refused to impose the death sentence. The defendant introduced evidence to cast doubt on the credibility of the co-defendants who turned State's evidence against defendant Abdullah. This was especially true in light of the jury's knowledge that the co-defendants received lesser sentences. Thus, there appeared to be some residual doubt in the jury's mind which led to its refusal to impose the death penalty.

Likewise in *State v. Payne*, 312 N.C. 647, 325 S.E. 2d 205, and *State v. Bray*, 321 N.C. 663, 365 S.E. 2d 571, the participation in the crimes and subsequent testimony of the co-defendants cast some doubt as to whether the victims' deaths in each case were a result of the acts of one or several. We believe this degree of residual doubt necessarily influenced the jury's decision to recommend a life sentence in each case.

Considering all of the cases in the proportionality pool, but more specifically the aforementioned seven, we believe that the present case compares most favorably to *Hutchins*, while being distinguishable in several respects from *Hill, Abdullah, Payne* and *Bray*.

As previously mentioned, in *Bray, Abdullah*, and *Payne*, the evidence was far more equivocal as to the degree of the defendant's culpability than it is here. It was such that it could have created a residual doubt in the minds of the jury as to the defendant's culpability. Likewise in *Hill*, this Court voiced the same kind of doubt in setting aside the sentence of death in favor of that of life imprisonment. Although there is some evidence that one of defendant Allen's co-defendants in the case at bar may have been involved in the actions at the patrol car, the evidence that the defendant was the person who pulled the trigger and killed Mr. Worley while he was in a defenseless position is relatively overwhelming. Any doubts to the contrary are largely dispelled by the voluntary and knowing confession of the defendant a short time after the events of 14 May 1985.

Thus, we hold that the case at bar aligns itself more closely with the facts and the defendant in *Hutchins*. In *Hutchins*, as in the present case, the defendant exhibited a course of conduct that was without regard for the law or its enforcement. This course of conduct culminated in the murder of a law enforcement officer while in the line of duty and was motivated by a desire to avoid or prevent an arrest (both factors being found by the jury as aggravating circumstances). In the present case, the killing was cold-blooded, unprovoked, and unjustified. The defendant, although not required to do so, stopped behind a highway patrolman, took a pistol from his van and as the trooper reached over in a defenseless position, shot him point blank three times resulting in the victim drowning in his own blood. This murder was the result of an intentional, knowing act of a responsible adult.

After a careful consideration of the briefs, transcripts, and record, we conclude that the sentence of death is not disproportionate or excessive, considering both the crime and the defendant. We therefore decline to disturb the sentence imposed.

No error.

Chief Justice EXUM dissenting as to sentence.

The majority concludes the sentencing hearing jury instructions on the unanimity requirement do not violate the federal constitution as interpreted in *Mills v. Maryland*, 486 U.S. ---, 100

L.Ed. 2d 384 (1988), on the basis of this Court's decision on this issue in *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988). For the reasons stated in my dissenting opinion in *McKoy*, I disagree with this conclusion and vote, because of this error in the instructions, to give defendant a new sentencing hearing.

When the majority in *McKoy* concluded that *Mills* had no application to North Carolina's jury instructions on unanimity, it relied in part on the United States Supreme Court's having denied certiorari in two North Carolina cases in which these instructions formed the principal basis for the defendant's petition for the writ. The majority said:

The Supreme Court granted certiorari in *Mills* "[b]ecause of the importance of the issue in Maryland's capital-punishment scheme." *Id.* at ---, 100 L.Ed. 2d at 393. The decision in *Mills* thus appears to be statute-specific. This conclusion is further supported by the Court's treatment of three cases immediately after the decision in *Mills*. The Court denied certiorari in two cases from this state which raised the issue of whether North Carolina's requirement of jury unanimity on the existence of mitigating circumstances is unconstitutional. *See State v. Holden*, 321 N.C. 125, 362 S.E. 2d 513 (1987), *cert. denied*, --- U.S. ---, 100 L.Ed. 2d 935 (1988); *State v. Gardner*, 311 N.C. 489, 319 S.E. 2d 591 (1983), *cert. denied*, --- U.S. ---, 100 L.Ed. 2d 934 (1988). However, in a Maryland case raising the same issue as in *Mills*, the Court granted certiorari, vacated the judgment, and remanded for further consideration in light of *Mills*. *See Jones v. Maryland*, 310 Md. 569, 530 A. 2d 743 (1987), *cert. granted and judgment vacated*, --- U.S. ---, 100 L.Ed. 2d 916 (1988). We recognize that "a denial of a petition for a writ of certiorari . . . carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review." *Maryland v. Baltimore Radio Show*, 338 U.S. 912, 919, 94 L.Ed. 562, 566 (1950) (Frankfurter, J., opinion re: denial of certiorari); *see also Singleton v. Commissioner of Internal Revenue*, 439 U.S. 940, 944, 58 L.Ed. 2d 335, 336 (1978) (Stevens, J., opinion re: denial of certiorari). We do not suggest that the denial of certiorari in *Holden* and *Gardner* alone indicates that the Court decided that the defendants' arguments in those cases were without merit. However, we view the Court's action on *Jones*

and its different treatment of *Holden* and *Gardner*, all in the immediate wake of *Mills*, as some indication that our capital-sentencing procedure differs sufficiently from Maryland's that *Mills* does not control the question presented here.

*McKoy*, 323 N.C. at 43-44, 372 S.E. 2d at 35.

On 3 October 1988 the United States Supreme Court entered the following order in *Oscar Lloyd v. North Carolina*, No. 87-6833 (our *State v. Lloyd*, 321 N.C. 301, 374 S.E. 2d 316 (1988)):

The motion for leave to proceed in forma pauperis and the petition for a writ of certiorari are granted. The judgment is vacated and the case is remanded to the Supreme Court of North Carolina for further consideration in light of *Mills v. Maryland*, 486 U.S. --- (1988).

This order was granted on the basis of (1) Lloyd's petition for writ of certiorari filed in April 1988 (before the decisions in *Mills* and *McKoy*), which relied solely on the assertion that North Carolina's unanimity jury instructions for mitigating circumstances in capital cases violated Lloyd's Eighth and Fourteenth Amendment rights and (2) a supplemental brief filed in September 1988 calling the Court's attention to its decision in *Mills* and our decision in *McKoy*.

To the extent the *McKoy* majority relied for its conclusion on the United States Supreme Court's denial of petitions for certiorari in other North Carolina cases involving the unanimity jury instruction issue, that conclusion has been substantially undercut by the United States Supreme Court's action in *Lloyd*. The *Lloyd* order, considered with the filings upon which it rests, renders the conclusion reached in *McKoy*—that *Mills* has no application to North Carolina's unanimity jury instructions—far more untenable than it otherwise was.

I concur in the result reached by the majority on the guilt phase issues.

Justice FRYE joins in this dissenting opinion.