STATE OF NORTH CAROLINA v. MISTY KELLER WITHERSPOON, Defendant

No. COA08-1003

(Filed 18 August 2009)

**Evidence— demonstration—use of female mannequin's head and newly purchased couch**

The trial court did not abuse its discretion in a first-degree murder case by failing to exclude a demonstration using a female mannequin's head and a newly purchased couch to refute defendant's version of the shooting.

Appeal by defendant from judgments entered 16 July 2007 by Judge Kimberly S. Taylor in Iredell County Superior Court. Heard in the Court of Appeals 24 February 2009.

*Attorney General Roy Cooper, by Special Deputy Attorney General Valerie B. Spalding, for the State.*

*Glover & Petersen, P.A., by Ann B. Petersen, for defendant-appellant.*

GEER, Judge.

Defendant Misty Keller Witherspoon appeals her first-degree murder conviction for the shooting death of her husband Quinn Witherspoon. Defendant's sole argument on appeal is that the trial court should have excluded testimony using a mannequin's head and a newly-purchased couch to refute defendant's version of the events. Defendant contends that the evidence constituted an experiment conducted under conditions not substantially similar to those at the time of the actual shooting. We conclude, however, that the use of the evidence was a demonstration not requiring substantially similar conditions. Consequently, no error occurred, and we uphold defendant's conviction.

Facts

Defendant and Quinn, a K-9 officer with the Concord Police Department, had been married for 11 years and had three children. At the time of Quinn's death, the couple was experiencing financial problems. In 2004, it was discovered that defendant had taken approximately $18,000.00 from the family's church, where Quinn served as the church's treasurer as well as a deacon. The pastor and

the deacons met and it was agreed that defendant would repay the money, and no police report would be filed.

Defendant was responsible for paying the family's bills and was behind in paying the utility bills and making the mortgage payments. The utility companies would threaten to cut off service to their house. On one occasion, Quinn had to borrow money from his supervisor to make the mortgage payment.

In March 2005, Quinn went to his credit union to discuss a delinquent credit card account. He believed defendant had a spending problem and was concerned that the monthly bills were not being paid promptly by defendant. Quinn had defendant taken off of his credit card account and had the spending limit reduced. He also paid off some debt with a personal loan that was repaid in monthly installments from his paycheck so that he did not have to worry about defendant's making the payments on time. When the credit union manager went over Quinn's credit report with him, Quinn became upset when he found out that there were credit cards and finance companies he did not know about listed on the report.

Defendant confided in her best friend, Leslie Burgess, that she and Quinn "had a lot of bills." Defendant would carry the home phone around with her in the house so that she could answer the phone. When Quinn and defendant were out of town, Burgess would come over to their house, write down the messages from the answering machine on a piece of paper, delete the messages, and put the note in the microwave so that Quinn would not see who had called. There would often be eight to 15 calls a day from creditors.

On 22 August 2005, Duke Power sent a letter stating that the Witherspoons owed $894.02, and on 6 September 2005, it sent a notice that the power would be shut off. Defendant called Duke Power around 1:36 p.m. on 13 September 2005 promising to pay the delinquent bill. Duke Power stated that the bill needed to be paid that day, or the power would be turned off the next day.

At the same time that defendant was talking to Duke Power, Quinn was napping on the couch in the living room. Their oldest child was at school and the two youngest children, twins, were asleep in their room. At approximately 2:08 p.m. on 13 September 2005, the Iredell County 911 call center received a call from defendant who said that she had been bringing Quinn's service pistol to him when she tripped and fell and the gun discharged. Defendant told the dis-

patcher that when the gun went off, it shot Quinn in the head. The call was transferred to the Mooresville Police Department dispatcher, who contacted Officer Corey Barnette.

Officer Barnette, who was the first to arrive at the scene, entered the house and walked into the living room where he saw Quinn laying face down on a couch. Quinn's pistol was on the floor beside the couch along with a yellow children's book. Defendant was standing roughly five feet away from the couch, facing it, with blood on her shorts and shirt. Defendant told Officer Barnette: "I was bringing him his gun and tripped on something and accidentally shot him in the head[.]" Officer Barnette checked Quinn for a pulse, but noticed that the blood on Quinn's head was already drying. He then took defendant and the other family members outside into the front yard.

Trooper Jason Fleming with the North Carolina Highway Patrol was friends with Quinn and quickly drove to the house when he heard that something had happened. Trooper Fleming went up to defendant to let her know that he was "there for her." She told him that she had accidentally shot Quinn: that she was getting something off a shelf, and Quinn's gun fell on the floor. The gun did not look safe to her, so she was carrying it to Quinn to make sure it was safe before she put it back. She slipped on a book, fell against Quinn, and the gun went off. Defendant repeated this statement to Trooper Fleming verbatim two or three times.

While Trooper Fleming was outside talking with defendant, the EMTs arrived and went into the house. They went over to the couch and checked Quinn's carotid artery for a pulse, but Quinn was dead. Detective Todd Marcum with the Mooresville Police Department arrived at the house and saw defendant sitting in the front yard with blood on her shirt and hands. When Detective Marcum entered the house, Officer Barnette advised him of the situation, and they asked the EMTs to leave the house so they could secure the scene for processing. During their walk through, Detective Marcum noticed Quinn's duty belt and some other gear on the floor of the hallway bathroom.

When other officers arrived, Detective Marcum went outside to talk with defendant. He asked her to come with him to the police station for an interview about "what happened in the house." While they drove, Detective Marcum noticed some blood on defendant's foot and her shorts. During the interview, defendant told Detective Marcum that Quinn kept his gun in the holster of his gun belt and

kept his gun belt in the hallway bathroom closet. She said she had been looking in the closet for some lotion. As she was looking through a basket on the back of the shelf, she pulled it forward to see into it better, and Quinn's gun fell out of its holster. Both the gun and the belt then fell out of the closet onto the floor. She thought the flashlight on the gun might have broken and decided to take the gun to her husband to make sure everything was functioning properly before putting it back.

Defendant said she picked up the gun, carrying it away from herself in her right hand. She had walked about half way across the living room when she slipped on a book and started stumbling forward. She fell into Quinn and heard a gunshot. She looked down and saw blood coming from Quinn's mouth and ears. She began looking for the phone and dropped the gun near the loveseat next to the couch when she found the phone in the cushions. Defendant put her right hand over the wound on the back of Quinn's head and stayed on the phone next to him until the police arrived. Detective Marcum wrote out a statement of what defendant had told him; she read it and signed it. Detective Marcum photographed the blood drops on defendant's feet and hands, and defendant gave Detective Marcum her clothes.

After defendant left with family members, Detective Marcum listened to the 911 call. Instead of immediately requesting help, defendant initially described bringing the gun to her husband, tripping and falling into her husband, and the gun going off. When the operator asked defendant about what type of gun had been involved, there was approximately 15 seconds of silence, during which time there were sounds of doors opening and closing and something falling and hitting the floor.

Detective Marcum then went back to the Witherspoons' home. He and other officers performed a walk through of the house based on what defendant told Detective Marcum. The medical examiner arrived, and after the police finished processing the scene, the medical examiner and the police rolled Quinn's body off the couch onto the floor. As they were rolling the body, a shell casing that had been stuck to Quinn's right arm fell onto the couch and rolled onto the floor. In the pillow that had been under Quinn's head, which was face down, they found a bullet.

Detective Marcum was surprised by the location of the shell casing because Quinn's service weapon was a right-ejecting semi-automatic pistol. Based on defendant's statement that she had been

standing at the middle of the front of the couch with the gun in her right hand when it discharged and the fact that Quinn's head was resting on the left side of the couch, the police had expected to find the shell casing toward Quinn's feet and not toward his head.

The investigating officers asked defendant the next day, 14 September 2005, to do a re-enactment of what happened because they believed there were inconsistencies between the physical evidence and defendant's story—particularly the location of the shell casing and blood flow patterns indicating that Quinn's head was not face down when he was shot. The re-enactment did not resolve the officers' concerns, so they asked on 23 September 2005 for defendant to make another written statement as to what happened. On 3 October 2005, and again, on 5 October 2005, the police interviewed defendant at the police station.

During the 5 October 2005 interview, defendant told the police a different version of the events. She claimed that she had intended to kill herself. She explained that at about 1:30 p.m. on 13 September 2005, she had a conversation with Duke Power about their bill, which was several months overdue. Defendant stated that after that, when she was looking through the bathroom closet for the lotion and the gun fell out, "she saw that as a sign" and picked up the gun and went outside. She went into a workshop off the back of the house and was going to shoot herself, but Quinn's K-9 dog, Tank, came in and would not stop nudging her.

She went back into the house and was standing at the middle of the backside of the couch where Quinn was sleeping. She was praying, and her legs got weak, so she put her hands on the back of the couch for support. She said one of the family's cats jumped up onto the back of the couch and ran across her arms, causing her to pull the trigger. She claimed that she did not tell the police what happened when they arrived because she believed that they would take her children away if they thought she was suicidal.

Detective Marcum asked defendant to repeat what happened with the cat, and defendant said that although the cat did run across her hand, that was not why she pulled the trigger. She said that she did not know why she had pulled the trigger. When defendant was asked about the location of the shell casing, she said that after she heard the gunshot and was walking around the head of the couch to find the phone, she almost stepped on it, so she picked it up. It was still warm, and she tossed it toward Quinn's body laying on the couch.

Defendant was arrested on 5 October 2005 and charged with first degree murder. Subsequently, defendant was also charged with three counts each of identity theft and obtaining property by false pretenses, as well as 37 counts of embezzlement. As part of a plea agreement, the charges for obtaining property by false pretenses were dismissed on 30 April 2007, and defendant pled guilty to the remaining 40 property offenses. Defendant pled not guilty to the murder charge and the case proceeded to trial on 25 June 2007.

As part of the State's case, Dr. Donald Jason, the medical examiner who performed the autopsy, testified that he found a gunshot entrance wound on the left side of the head, just above and slightly in front of the ear. There was stippling around the entrance wound. The exit wound was just below the nose on the right side. Doctor Jason further stated that as part of the autopsy, after he had removed the brain, he inserted a probe in the entrance wound and out through the exit wound to track the bullet's trajectory. Based on his measurements, the bullet passed through Quinn's skull "from left to right 25 degrees and downward by 40 degrees." Doctor Jason stated that, in his opinion, Quinn was shot from less than six inches away.

Detective Marcum also testified—over defendant's objection—that he and other officers obtained a mannequin and, based on the autopsy measurements and photographs, inserted wooden dowels in the head, corresponding to the entrance and exit wounds and the trajectory of the bullet. The officers then used the crime scene photographs to position the mannequin on a couch purchased for the trial in order to recreate the position of Quinn's head as they found it.

Detective Marcum testified that based on the reconstruction, defendant could not have been standing where she said she was when the gun discharged. Detective Marcum further testified that in order for the bullet to have entered Quinn's head at the correct angle, defendant would have had to have been standing over Quinn at the arm of the couch at the time the gun went off, as opposed to standing at the middle of the couch as defendant claimed. The approximately 45-degree downward trajectory of the bullet also indicated that the shot was fired from behind the couch rather than from the front, as defendant had first stated.

Finally, Detective Marcum testified that photographs of the blood flow patterns on Quinn's head indicated that his head had to have been "almost level or [at] a slight incline" when he was shot.

Otherwise, "the blood would have been flowing uphill . . . ." Based on the blood flow patterns and the reconstruction, the police believed that Quinn's head had been repositioned after he was shot but before the police arrived.

The State also presented evidence that after Quinn's death, his survivors received $82,102.27 in government death benefits; $91,000.00 in life insurance; and $24,138.68 from a 401(k). In total, defendant received $197,240.95 as a result of Quinn's death.

Although defendant did not testify at trial, she presented expert testimony and testimony from family and friends. Dr. Page Hudson, a forensic pathologist, testified that, based on his review of Quinn's autopsy photographs and reports, he believed that the gun was fired from more than two feet away. In addition, Dr. Jerry Noble, a clinical psychologist, testified that defendant suffered from depression, anxiety, and stress disorders at the time of the shooting. Dr. Noble expressed the opinion that defendant could not "form the specific intent to shoot and kill her husband because she was severely depressed and anxious and [sic] affecting her ability to think, concentrate, and make decisions."

The jury convicted defendant of first degree murder. The trial court sentenced defendant to life imprisonment without parole for the murder conviction, followed by three consecutive presumptive-range terms of 13 to 16 months for the identity theft charges, followed by two consecutive presumptive-range terms of 6 to 8 months for the embezzlement charges. Defendant timely appealed to this Court.

## Discussion

Defendant characterizes the State's use of the mannequin head and couch as an in-court "experiment" relating to the State's "hypothesis about the trajectory of the bullet" and defendant's position relative to Quinn when the gun was fired. In arguing that the evidence should have been excluded because conditions in the experiment were not substantially similar to the conditions at the time of the shooting, defendant points to the fact that the police used a different couch and the mannequin head was smaller than Quinn's head because it was a female head.

North Carolina "recognize[s] a distinction between demonstrations and experiments." *State v. Golphin*, 352 N.C. 364, 433, 533 S.E.2d 168, 215 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305, 121 S. Ct. 1379-80 (2001). "An experiment is 'a test made to demon-

strate a known truth, to examine the validity of a hypothesis, or to determine the efficacy of something previously untried.' " *Id.* (quoting *State v. Allen*, 323 N.C. 208, 225, 372 S.E.2d 855, 865 (1988), *death sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601, 110 S. Ct. 1463 (1990)). A demonstration, on the other hand, is " 'an illustration or explanation, as of a theory or product, by exemplification or practical application.' " *Id.* at 434, 533 S.E.2d at 215 (quoting *Allen*, 323 N.C. at 225, 372 S.E.2d at 865).

The distinction between the two is the threshold issue in this appeal. Evidence pertaining to an experiment is "competent and admissible if the experiment is carried out under substantially similar circumstances to those which surrounded the original occurrence." *State v. Locklear*, 349 N.C. 118, 147, 505 S.E.2d 277, 294 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559, 119 S. Ct. 1475 (1999). In contrast, a demonstration does not require substantially similar circumstances. *See Golphin*, 352 N.C. at 437, 533 S.E.2d at 217 ("Although [defendant] argues the circumstances surrounding the demonstration were dissimilar to those surrounding the incident, that is not the focus of our review in the instant case."); *State v. Westall*, 116 N.C. App. 534, 543, 449 S.E.2d 24, 30 ("Defendant claims the procedure was an experiment erroneously admitted because it was not conducted under circumstances reasonably similar to those existing at the time of the robbery. . . . The demonstration . . . was not an experiment requiring substantially similar circumstances."), *disc. review denied*, 338 N.C. 671, 453 S.E.2d 185 (1994). Consequently, defendant's arguments regarding substantial similarity hinge on defendant's assumption that the evidence involved an experiment.

In *Golphin*, the defendant argued that when two law enforcement officers were sprayed in the face with pepper spray, that was an experiment performed under circumstances dissimilar to when he was sprayed with pepper spray. 352 N.C. at 433, 533 S.E.2d at 215. In holding that the use of the pepper spray was a demonstration rather than an experiment, the Supreme Court observed that the purpose of the presentation was to "illustrate or explain to the jury the effects of pepper spray by practical application." *Id.* at 436, 533 S.E.2d at 216. Consequently, the Court held that the issue of whether the "circumstances surrounding the demonstration were dissimilar to those surrounding the incident . . . is not the focus of our review in the instant case." *Id.* at 437, 533 S.E.2d at 217.

In this case, the police were not performing an experiment with the mannequin head and couch, but rather were using the model to

"illustrate or explain" the physical conditions existing at the time of the shooting, including the position of Quinn's head and the path and direction of the bullet. *Id.* at 436, 533 S.E.2d at 216. The State then used this recreation of the crime scene to demonstrate that the shooting could not have occurred the way defendant claimed it did.

In *State v. Murillo*, 349 N.C. 573, 509 S.E.2d 752 (1998), *cert. denied*, 528 U.S. 838, 145 L. Ed. 2d 87, 120 S. Ct. 103 (1999), the Supreme Court treated virtually identical evidence as a demonstration. In *Murillo*, the victim, who was the defendant's wife, died from a single gunshot wound to her right temple, but the bullet had passed through the victim's right forearm before entering her head. *Id.* at 584, 509 S.E.2d at 758. The victim's sister testified at trial that she was about the same size as the victim and that they wore the same size clothes. *Id.* at 601, 509 S.E.2d at 768. Similar to here, based on autopsy photos, the victim's sister "demonstrated for the jury that her forearm and head could not be positioned such that the bullet holes matched as they did in the victim's body if an accident had occurred in the way defendant claimed." *Id. See also State v. Barnes*, 345 N.C. 184, 213-14, 481 S.E.2d 44, 60 (discussing "demonstration" that included "reconstruction of events" and "three-dimensional evidence involving the mannequins and dowels that [witness] used to illustrate her testimony" regarding "where the shooters and victims were positioned"), *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134, 118 S. Ct. 196 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473, 118 S. Ct. 1309 (1998); *State v. Hunt*, 80 N.C. App. 190, 193-94, 341 S.E.2d 350, 353 (1986) (holding that officer's showing of how to operate shotgun was demonstration when officer had not performed any tests or experiments on shotgun).

Accordingly, we hold that the evidence of the mannequin and couch in this case amounted to a demonstration and not an experiment. The test for determining whether a demonstration is admissible "is whether, if relevant, the probative value of the evidence 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury' " under Rule 403 of the Rules of Evidence. *Golphin*, 352 N.C. at 434, 533 S.E.2d at 215 (quoting *Allen*, 323 N.C. at 225, 372 S.E.2d at 865). The decision whether relevant evidence should be excluded pursuant to Rule 403 is within the discretion of the trial court, and the court's ruling will be reversed on appeal only upon a showing of abuse of discretion. *Id.* Because defendant assumed that the evidence was an experiment, she has not addressed the admissibility of the evidence as a demon-

stration. Nevertheless, under *Murillo*, we hold this evidence was properly admitted.

As the Supreme Court explained in *Murillo*: "Where, as here, the asserted defense is accident, a demonstration tends to 'make the existence of [a] fact that is of consequence . . . more probable or less probable than it would be without the evidence.' " 349 N.C. at 601, 509 S.E.2d at 768 (quoting N.C.R. Evid. 401). Moreover, where the evidence on an issue is conflicting, our appellate courts have "upheld demonstrations intended to illustrate flaws in the prosecution or defense theory, or to rebut a witness's testimony." *State v. Fowler*, 159 N.C. App. 504, 510, 583 S.E.2d 637, 642, *disc. review denied*, 357 N.C. 580, 589 S.E.2d 355 (2003).

Similar to *Murillo*, the central issue at trial in this case was whether the shooting was premeditated or whether it was accidental. The demonstration was probative of premeditation because it related to whether defendant was standing at the middle of the couch, resting her hands on the back of the couch, as she claimed, or whether she was standing over Quinn's head near the armrest when the gun discharged. Thus, the demonstration in this case was relevant to a material issue at trial. *See Murillo*, 349 N.C. at 601, 509 S.E.2d at 768 (finding demonstration relevant under Rule 401 where defendant claimed gun went off accidentally, but evidence showed gun could not have discharged as defendant asserted); *Barnes*, 345 N.C. at 214, 481 S.E.2d at 60 (holding demonstration concerning bullet paths was "probative with respect to premeditation and deliberation").

With respect to the countervailing factor of unfair prejudice under Rule 403, the Supreme Court has "consistently noted that '[n]ecessarily, evidence which is probative in the State's case will have a prejudicial effect on the defendant; the question is one of degree.' " *State v. Hedgepeth*, 350 N.C. 776, 785, 517 S.E.2d 605, 611 (1999) (quoting *State v. Wilson*, 345 N.C. 119, 127, 478 S.E.2d 507, 512-13 (1996)), *cert. denied*, 529 U.S. 1006, 146 L. Ed. 2d 223, 120 S. Ct. 1274 (2000). In *Murillo*, 349 N.C. at 601, 509 S.E.2d at 768, virtually identical evidence to that presented in this case was upheld as not being unfairly prejudicial to the murder defendant. We reach the same conclusion here.

The record indicates that the demonstration was fairly brief and not conducted in an inflammatory manner or intermixed with speculative testimony. *See Fowler*, 159 N.C. App. at 513, 583 S.E.2d at 643 (holding demonstration of how defendant choked victim was not

unfairly prejudicial when demonstration was no longer than neces-
sary, unemotional, and did not involve speculation by testifying wit-
ness). Further, although defendant has asserted in a conclusory fash-
ion that the smaller size mannequin head and the slightly different
dimensions of the couch "would have an impact on the direction from
which the shot could have been fired," defendant has not specifically
explained what that impact was—defendant has not demonstrated on
appeal that, in the absence of these differences, the demonstration
would have been more likely to support defendant's description of
what occurred.

Thus, any prejudicial effect of the State's use of the mannequin
and couch in this case is "limited to the prejudice inherent in all evi-
dence that rebuts or undermines defense evidence." *Id.* Given the
probative value of the demonstration on the contested issue of pre-
meditation versus accident, the trial court did not abuse its discretion
in admitting the evidence.

No Error.

Judges McGEE and BEASLEY concur.