IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 29, 2013 Session

## STATE OF TENNESSEE v. STANLEY B. HILL

### Appeal from the Circuit Court for Blount County
No. C-14909      Michael H. Meares, Judge

### No. E2012-00289-CCA-R3-CD - Filed August 30, 2013

The defendant, Stanley B. Hill, was convicted by a Blount County jury of the first degree premeditated murder of his wife, Vickie Hill, and sentenced to life imprisonment. On appeal, he argues that the trial court committed reversible error by: (1) allowing the medical examiner to use demonstrative evidence that was inherently unreliable, unfairly prejudicial, cumulative, and not disclosed to defense counsel prior to trial and (2) excluding a piece of physical evidence as a sanction for his violation of the reciprocal discovery obligations under Rule 16 of the Tennessee Rules of Criminal Procedure. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Richard L. Gaines, Knoxville, Tennessee (on appeal); Jeffrey Z. Daniel, Knoxville, Tennessee, and James R. Scroggins, Jefferson City, Tennessee (at trial), for the appellant, Stanley B. Hill.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Michael L. Flynn, District Attorney General; and Tammy M. Harrington and Robert L. Headrick, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

In this matter, the defendant was convicted of the first degree murder of his wife, unsuccessfully staging her death to appear as a suicide. The case presents uncommon facts

and unusual issues.

At approximately 6:57 on the morning of December 31, 2003, the defendant called 911 to report he had just discovered that the victim had committed suicide by hanging herself in the garage of their home. When confronted with inconsistencies in the physical evidence, the defendant changed his story, telling investigators that he had, at the request of the victim, assisted in her suicide by devising a rope system that she used to hang herself from a bed and by straddling her body and holding her down to prevent her from inadvertently aborting the suicide during her death throes. He claimed that his staging of the suicide scene in the garage was also at the request of the victim, who had not wanted him implicated in her death, and that the injuries to the victim's head occurred post-mortem when he dropped her to the floor as he was transporting her body to the garage and attempting to hang it from the rafters. The autopsy, however, revealed that the victim's head injuries occurred before death, and the defendant was subsequently indicted by the Blount County Grand Jury with the first degree premeditated murder of the victim. Released on bond, the defendant fled the area. He was eventually discovered in July 2006 in Los Angeles, California, with several different identifications in his possession. He was arrested and brought back to Tennessee, where he was tried before a Blount County Circuit Court jury from May 12-16, 2008.

**Trial**

According to the State's proof at trial, the first officer who responded to the defendant's 911 call was met in the driveway by the defendant, who informed him that he had gotten up that morning, looked for the victim, and found her in the garage, where she had hanged herself. The defendant told the officer that the victim had attempted suicide about a year earlier by taking an overdose of her anti-depressant medication but that she had not mentioned suicide recently. When investigators arrived shortly thereafter, the defendant told them that he and the victim had been married about three years and had a two-year-old son, and that she had suffered from depression since the birth of her first child ten years earlier and had recently become severely depressed because she felt that she was a failure and her life was going nowhere. Before the investigators went out to examine the body more closely, the defendant told them that he had dropped the victim's body when he cut her down from the rope, which had caused a knot on her head and a scrape mark on her side.

The victim's body was in the back of the detached garage lying on its back on top of a comforter near an area where a knotted rope was attached to a pulley system hanging from a two-by-six board attached to the ceiling rafters. There was no suicide note. The initial story the defendant gave of having laid the victim on her back on the garage floor after cutting her loose from the rope was inconsistent with the physical evidence, which, among other things, included sawdust on the front of the victim's pants, dirt and debris on the front

part of her feet, a rectangular pattern impression on her stomach that matched the pattern of a pile of flooring materials in the garage, and two ligature marks on her neck. One of those two marks was shallow and went up, consistent with the mark left on a body that has been hanged, while the other one was deep and went straight back, inconsistent with a hanging. Investigators, therefore, ordered an autopsy on the victim and transported the defendant to the sheriff's department for questioning.

The defendant initially repeated his story of the victim's having committed suicide in the garage. He changed his story, however, after the investigators informed him that the autopsy showed that the victim was already dead at the time her body was hanged. In his new version, the defendant said that the victim wanted to commit suicide but was afraid that she would botch the job if she tried alone, so she asked him to help her prepare and execute the plan. He said she repeatedly begged for his help before he finally relented and devised a method for her to hang herself with a rope by rolling off the double bed in the bedroom of her older son, who was away from home at the time the victim ultimately chose to commit suicide. The defendant stated that the victim told him she would start "kicking and fighting" during the suicide and made him promise not to let her get up. She also made him promise to stage the scene in the garage because she was concerned about what would happen to their two-year-old son if the defendant was implicated in her death. The defendant's statement reads in pertinent part:

> I showed her how to set it up. She did it all. And, uh, then she basically rolled off the edge of the bed and it came pretty close to parallel. But it – all the pressure was on her neck. I promised her I'd do it and I did. I didn't let her move, claw out.

The defendant stated that the victim had unsuccessfully attempted suicide at least twice in the past, that she lived on a roller coaster of emotions, that her anti-depressant medication had ceased working, and that she became tired of the roller coaster and begged him to help her end her life because she was convinced that she was making everyone around her miserable. The defendant said that the previous night the victim announced that it was time to execute the suicide plan. He described what occurred:

> She said that last night was the night. She said that, uh, she didn't want to go on anymore. She didn't want to make anybody else miserable. She wanted me to set the rope up. All it was, was a loop that went around the bottom of the bed. And it had another loop and, uh, through that loop, you could twine the rest of the rope to make the noose. And then it had a long end on it. The long end was tied up. And what she did, she just rolled off the bed, which, uh, tightened the noose, left her head about that far off the ground, maybe. And,

uh, when she started kicking and screaming, I promised her that I would do it, and I did.

[Detective]: What did you do?

[Defendant]: I just – I just held her down.

The defendant stated that he straddled the victim, holding one hand on her chest and another on her side, to prevent her from aborting her suicide. When asked how long he had to hold her down before she died, he replied:

It seemed like forever. I don't know. I couldn't – I don't know whether it was a minute, it was five minutes, one minute, three minutes. It just seemed like forever. When she stopped . . . kicking and she was moving her arms, I kind of let go and she was able to release herself and some air come up. And it scared me, and I went back down again. I held it for another minute and I realized that was just the air escaping her. It was already over. And she was finally at peace. She was where she wanted to be.

The defendant stated that he dropped the victim, causing her head to "pop on the concrete" as he was carrying her body out to the garage after her suicide. He said that she was too heavy for him to carry the entire distance and that he therefore had to drag her part of the way, causing various abrasions and scrapes on her body. He dropped her again, causing another head injury, as he was trying to hoist her body up to hang from the ceiling rafters. He lacked the strength to get her all the way up, and he ended by laying her on the floor of the garage.

The defendant stated that the victim had planned her suicide for two months and that he had worked for three or four weeks to devise the rope system that she used to execute it. He stated that the victim wanted him to devise a system that she could implement alone, but he was unable to do so. He said that he did not tell the investigators the truth when they first arrived at his house because he was afraid that if he did, it would result in his separation from his two-year-old son, who was "[his] life."

The defendant informed the investigators that the rope the victim used to commit suicide was behind the mattress still tied to a leg of the victim's son's bed. Unknown to the defendant, investigators had already discovered a yellow rope with loops and knots in it tied to the bed's leg and in the location described by the defendant. The investigators bagged that piece of rope as evidence and asked the defendant to partially reenact the alleged assisted suicide using a different rope supplied by them and with a female officer playing the role of

the victim. The lengthy videotape of the reenactment, which took place in the victim's son's bedroom, was played for the jury at the defendant's trial and admitted as an exhibit in the case. After the reenactment, investigators took the defendant back to the sheriff's department where they conducted a third interview. In the final interview, the defendant denied that he ever hit the victim before her death. He acknowledged that he and the victim had marital problems and that she had threatened divorce after the birth of their son but denied that she had mentioned divorce recently. He acknowledged that the victim had repeatedly insulted him and that he was angry and "fed up" with her behavior on the night of her suicide, which was one of the reasons he ultimately agreed to help her:

> I guess I was somewhat agitated at the way she treated me that . . . last night. I don't even know what day it is. Night before last. She said that that was the time and that it was going to happen. And, uh, I was upset and I was angry, and I was just tired of it, I guess. I – she had talked about it for so long, I was tired of talking about it. I mean, if you want something that bad and there's no talking you out of it – I mean, I guess I was just fed up.

The defendant's claim that the victim had not recently threatened divorce was contradicted by testimony of the victim's mother, who said the victim told her in October 2003 that she wanted to get a divorce and that, after the victim's death, she had found in the defendant's bathroom an undated handwritten letter in which the victim told the defendant that she no longer loved him and wanted a divorce. The victim's mother additionally testified that it would have been against the victim's religious beliefs to commit suicide, that the victim had never been suicidal, and that the victim had appeared normal and had been making plans for the future when she last saw her the day before her death. Corroborating evidence of the victim's having made plans for the future included evidence that she had purchased furniture on layaway on December 26, 2003, and on November 1, 2003, had signed a lease with an antique mall that did not expire until February 2004.

In addition to the above evidence, the jury heard testimony from one of the investigators that the defendant had disappeared from his parents' home on November 20, 2005, less than a month before his trial was originally scheduled to begin, and been arrested in Los Angeles on July 3, 2006, in possession of a book entitled How to Change Your Identity and Erase Bad Credit, as well as two identification cards both bearing the defendant's photograph, one of the cards supposedly from Louisiana in the name of Shawn Ashton Myers and the other from Missouri bearing the name James Robert Reddy. Also, the defendant had social security cards in the names of James Ronnie Kemp and Benjamin R. Doolittle and a credit card in the name of Keith McKeyton.

Additional witnesses called by the State to refute the defendant's assisted suicide

claim included the victim's primary care physician, the victim's gynecologist, the victim's co-worker and friend, and the victim's brother. The primary care physician testified that he had treated the victim for several years for chronic depression and prescribed various anti-depressants, but she never expressed any suicidal ideation and reported on her last visit on December 10, 2003, that "things were going great." The victim's gynecologist, similarly, testified that the victim never appeared severely depressed or suicidal to her, including during the last time that she saw the victim, which was on December 16, 2003, two weeks before the victim's death. On that date, the victim, a hairdresser, cut the gynecologist's hair. The victim's friend and co-worker testified that the victim told her in October 2003 that she was contemplating divorce, that the victim told her about a month before the victim's death that she had written a letter to the defendant telling him of her desire for a divorce, and that the victim, in the weeks before her death, had begun circling apartment advertisements in the newspaper. The victim's brother testified that approximately two weeks before her death the victim asked him to be on the lookout for affordable property for her to buy because she planned to leave the defendant. He said that when he saw her on Christmas Day, the victim reminded him of her request.

The State's final witness was the Knox County medical examiner who performed the autopsy of the victim's body. She testified that the cause of death was ligature strangulation, rather than hanging, and that the victim's lethal injuries could not have been inflicted by the assisted suicide device as demonstrated by the defendant in the reenactment videotape. The medical examiner also testified about the victim's various non-lethal injuries, including pre-mortem blunt force trauma to the head. Over the objection of the defendant, the medical examiner used a bed brought into the courtroom and the rope that had been found in the defendant's residence to demonstrate that the rope was too short for the victim to have been hanged from the bed and that the device would not have produced the lethal strangulation ligature mark she found on the victim's neck.

The defendant presented two witnesses in his defense: a clinical psychologist and himself. The psychologist testified that her research revealed that only fifteen to twenty-five percent of the people who commit suicide in the United States leave a suicide note and that men are more likely to leave a note than women. In his testimony, the defendant essentially repeated what he told the investigators about the victim's volatile emotional health, worsening depression, previous unsuccessful suicide attempts, pleas with him to assist her with her suicide, and his role in devising the rope system and holding her down on the morning she chose to execute her plan. He denied that he hit or assaulted her or that he and the victim had any kind of physical or verbal fight on the day of her suicide. He stated that he fled the jurisdiction before his original trial was scheduled to begin because he was "scared out of [his] mind," and "felt totally helpless" because the officers did not believe his account of what happened.

-6-

The defendant testified that the rope that the medical examiner used to perform her courtroom demonstration was in a different condition than it had been at the time of the victim's suicide because he had, after the victim's death, cut the end of it off and thrown it behind the basement ceiling tiles. He said he did not reveal that detail to his counsel or anyone else until during the trial, after watching the courtroom demonstration by the medical examiner. When asked why he had cut off the end of the rope and hidden it, he explained:

> It went back to our plan. I mean, it was [to] absolve me of any implications. When I took [the victim] down there and after I couldn't get her up on the pulley, I left her laying and I went back upstairs and I got the towels that were used. I had a knife in my pocket and I used it and I cut the end of it off, which I had used to untie that. That would have shown that I had been there. And I took it downstairs and I threw – I had been routing some wires for surround sound speakers down in the basement. And I had pushed some ceiling tiles back. When I got to the bottom of the steps, I threw the rope up into that ceiling where the ceiling was open. And I took the towels to the laundry room and left them there. And I was basically just trying to, number one, at that time, it was my intention that she was to hang in the garage, according to what we had discussed. And it was to make the bedroom not show what had happened, I guess.

On cross-examination, the defendant was unable to say why he had not thrown the entire rope up into the ceiling instead of just cutting off an end of it. He said he did not understand why he had done a lot of things that he did, other than that he was physically, mentally, and emotionally worn out at the time and was not "thinking properly." Finally, he testified that he did not tell the detectives about the piece of rope he had thrown into the ceiling because they gave him a different rope for the reenactment and he did "not think about the rope" that he had actually used for his wife's assisted suicide.

Prior to the defendant's presentation of his proof, defense counsel, to whom the defendant had just revealed that he had cut off a piece of the rope and hidden it in the ceiling tiles, received permission from the trial court to go to the defendant's former home to search for the piece of rope. At the court's direction, three law enforcement officers accompanied one of defense counsel to the residence, obtained consent from the current homeowner, and discovered a piece of yellow rope in the basement ceiling in the location indicated by the defendant. After the defendant concluded his testimony, the State moved to exclude the evidence on the basis that the defendant had not disclosed it as part of reciprocal discovery. The trial court sustained the State's motion but allowed the defendant to put on an offer of proof, which consisted of testimony by Detective Sergeant Shannon Carswell of the Blount Count Sheriff's Department about her discovery in the basement ceiling tiles of the home an

approximately four foot long length of yellow rope that was similar in appearance to the rope that had been found in the victim's son's bedroom.

Following deliberations, the jury convicted the defendant of the premeditated first degree murder of the victim, and the trial court sentenced him to life imprisonment. This appeal followed.

## ANALYSIS

### I. Medical Examiner's Use of Demonstrative Evidence

The defendant contends that the trial court committed reversible error by allowing the medical examiner to use the bed and rope as a demonstrative aid during her testimony. Among other things, he argues on appeal that the State violated Rule 16 of the Tennessee Rules of Criminal Procedure by not providing prior notice of the experiment, which prejudiced his ability to present a defense; that the demonstration was highly inaccurate and unreliable because the bed, mattress, and rope employed in the demonstration "varied considerably" from the bed, mattress, and rope from the crime scene; and that the demonstration was unnecessary and "needlessly cumulative" to the medical examiner's lengthy testimony.

The admission of demonstrative exhibits generally lies within the discretion of the trial court, whose decision will not be overturned absent a clear showing of abuse. State v. West, 767 S.W.2d 387, 402 (Tenn. 1989); State v. Delk, 692 S.W.2d 431 (Tenn. Crim. App. 1985); State v. Wiseman, 643 S.W.2d 354, 365 (Tenn. Crim. App. 1982). To be admissible, evidence must be relevant, *i.e.,* "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." See Tenn. R. Evid. 401. Relevant evidence, may, however, be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. As stated in Tennessee Law of Evidence,

> Demonstrative evidence frequently consists of visual aids. For example, a lawyer may use a life-size mannequin in a murder case to demonstrate the paths of the bullets through the victim's body. Similarly, x-rays can be admitted to illustrate a doctor's testimony regarding an individual's medical condition. Photographs, videotapes, and other recordings serve as aids for the trier of fact. They are typically introduced in conjunction with related testimony to give the jury or judge a more extensive and comprehensive

perception of the testimony, and, sometimes, its relation to other evidence.

. . . .

Demonstrative evidence, like other evidence, is subject to exclusion under the rules of evidence, such as Rule 401 (relevance). It may also be excluded under Rule 403 as too prejudicial.

Neil P. Cohen et al., Tennessee Law of Evidence, § 4.01[d] (6th ed. 2011). We review this issue, therefore, under an abuse of discretion standard.

The medical examiner, Dr. Darinka Mileusnic-Polchan, testified at great length regarding the autopsy findings, explaining, among other things, why she determined that the cause of death was ligature strangulation rather than hanging. She said that the deeper, horizontal ligature mark was the lethal one and that it resulted in "a lot of injury" to the victim's skin and underlying tissue, with "one interruption," which "[f]requently . . . happens if the victim tries to free the neck and put the finger in. So, the interruption in the uniform pattern of the strangulation ligature mark is frequently the victim's fingers, especially on the front of the neck." The victim also had broken fingernails, which, according to Dr. Mileusnic-Polchan, were "classic defense injuries for strangulation." She testified that an attempt to hang the body was made after the victim's death, which resulted in the fainter, vertical ligature mark visible on the victim's neck. She said the victim had various post-mortem scrapes and abrasions on her body, consistent with the defendant's account of having dragged her body, as well as pre-mortem blunt force trauma to the head and other pre-mortem abrasions.

Dr. Mileusnic-Polchan explained the differences between a hanging and a strangulation and the different kinds of injuries, both internal and external, that each leaves on a body. Among other details, she testified that a hanging, unlike a strangulation, has a "suspension point" and leaves the impression of the ligature's pattern on the victim's skin:

First, I'm going to start with the external evidence of injury and compare hanging versus strangulation. In hanging, the main thing is going to be the furrow that is pretty accurate and almost identical pattern to the ligature that is used. Being if it's going to be a rope, there's going to be a pattern of the rope impressed on the skin. The other thing, the furrow itself is going to be just that impression. There won't be a lot of bruising, there won't be a lot of abrasion or scraping of the skin. If there is any superficial scraping, that's only if the skin is pinched or the rope kind of slides upwards as the hanging kind of progresses.

-9-

The next thing very important is that in hanging, there's a suspension point; meaning that the ligature impression around the neck is going to frequently curve, it's going to be either upward or downward, of course. Sometimes it can be horizontal, but inevitably it has to have a suspension point. And frequently that suspension point on the knot, sometimes sliding knot, depending on the mechanism used, is going to be firmly and nicely impressed on the skin. Usually, it's on the side of the neck or back of the neck. Very rarely it's going to be the front, of course. Because of that, internally, as already described, we have impression. We don't have much of the bruising injury that is going to cause hemorrhage. . . .

As opposed to that, strangulation with a rope, let's say, with the ligature is going to be inevitably [a] horizontal mark. It's going to inevitably encircle the neck completely, and because there's a struggle, it's going to be very deep and it's going to be associated with a lot of hemorrhage and bruising, a lot of scraping. Much more than the hanging.

Dr. Mileusnic-Polchan testified that, in formulating her final opinion it was a "clear-cut strangulation" rather than "a case of hanging . . . with the device of assisted suicide," she relied not only on her autopsy findings but also on her review of the videotaped reenactment of the alleged assisted suicide, from which she determined that the victim's lethal injuries could not have been produced by the device demonstrated by the defendant. After the trial court overruled the defendant's objection, the State set up a double bed in the courtroom, which Dr. Mileusnic-Polchan used to demonstrate that the rope that had been found in the victim's home was not long enough to wrap around the victim's body and form a noose to hang her, as the defendant had demonstrated in his reenactment. She also used the bed and rope to illustrate that the lethal ligature marks were inconsistent with ones that the rope would have caused if the victim had rolled off the bed and been hanged as the defendant claimed. Her testimony reads in pertinent part:

So, if we're go[i]ng to utilize this to create a noose and for this body to be close to the floor, I'm going to have . . . a problem with this. As a matter of fact, no matter what we do this cannot even come off the mattress.

The other thing that I also want to point out, as you recall, when you looked at the ligature marks was there was no pattern to it. Especially where it was the deepest, as opposed to the braided pattern of this rope, that would definitely leave a pattern on the neck as such. So, if we tried to do this around the neck (indicating) – so if the mechanism is supposed to work in such a way that now she would roll off the bed, come this way down (indicating). And

-10-

then another thing is that as this is tightening, it's going to leave an area that it's free on the neck. So, it won't encircle the neck all the way. And so there's no way that mechanism, the way it's positioned and fashioned here, the suspension point, that is going to leave a suspension – or impression all the way around the neck as we see it on the victim. And the other thing again, there is no way – and even if I cut the entire thickness of this mattress, there is no way that we would have enough rope to go around the belly of a 190-pound woman to create a mechanism to pull her body down and make her parallel with the floor.

And then, finally, it's – the nightstand is here and she is more here, there is no way to create a horizontal pattern. It had to be an upward pattern to go at an angle to the (unintelligible) to the bed.

So, basically, there is nothing with this mechanism that's consistent, even if we cut the thickness of the mattress in half.

On appeal, the defendant contends that the "contraption" used by the medical examiner to demonstrate her testimony constituted both a tangible object and a scientific experiment that the State was required to disclose to defense counsel prior to trial, pursuant to Rule 16 of the Rules of Criminal Procedure. He further argues that he was prejudiced by the Rule 16 violation because, had his defense counsel received proper notice of the State's intent to conduct such a demonstration, "in all probability, the missing piece of rope at the center of this controversy would have been disclosed to both [d]efense counsel and the prosecution." The State responds that the trial court allowed defense counsel to voir dire the medical examiner about her demonstration before she showed it to the jury and argues that the court acted within its discretion in allowing the demonstration, which the medical examiner used not in an attempt to create an exact duplication of the defendant's reenactment, but instead to support her opinion that the victim's death was not caused by hanging and could not have occurred in the method described and demonstrated by the defendant. We agree with the State, as we will explain.

Tennessee Rule of Criminal Procedure 16 provides in pertinent part:

Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph . . . tangible objects, . . . , if the item is within the state's possession, custody, or control and:

(i) the item is material to preparing the defense;

-11-

(ii) the government intends to use the item in its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

Tenn. R. Crim. P. 16(a)(1)(F). Subsection (G), "Reports of Examinations and Tests," provides that:

Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments, if:

(i) the item is within the state's possession, custody, or control;

(ii) the district attorney general knows –or through due diligence could know–that the item exists; and

(iii) the item is material to preparing the defense or the state intends to use the item in its case-in-chief at trial.

Tenn. R. Crim. P. 16(a)(1)(G).

Initially, we note that the defendant was already well aware of the alleged assisted suicide method that the medical examiner demonstrated, as he had, himself, demonstrated at length and in great detail the same procedure in a videotaped reenactment conducted at his home. Furthermore, although the double bed in the courtroom demonstration was different from the bed on which the defendant reenacted the scene in his home, defense counsel was allowed to voir dire the medical examiner about those and other differences while the jury was out of the courtroom and to cross-examine her following her demonstration to the jury. We note that the double bed itself was not admitted as an exhibit but used only for demonstrative purposes to aid the medical examiner's testimony.

The defendant cites State v. Matthew Carfi, No. M2005-01467-CCA-R3-CD, 2006 WL 2788523 (Tenn. Crim. App. Sept. 29, 2006), perm. app. denied (Tenn. Mar. 5, 2007), to argue that the State's failure to provide notice of the assisted suicide demonstration constituted a discovery violation that prejudiced his ability to present a defense. In that case, we affirmed the trial court's ruling that the defendant failed to meet his burden of showing that the State violated Rule 16 of the Tennessee Rules of Criminal Procedure by not providing notice of its intention to use a stick as a demonstrative exhibit at trial. Id. at *30. We note, however, that in our analysis of the issue, we did not address the State's argument

that "the rules of discovery do not require that every demonstrative aid be provided to opposing counsel," id. at \*29, but instead affirmed the trial court's ruling on the basis that the State was not in possession of the stick until the day before trial, the defendant was unable to show how his trial preparation would have been different had he received earlier notice of the State's "intention to use the stick at issue[,]" and the defendant failed to raise the alleged discovery violation as an issue in his motion for new trial. Id. at \*30. As such, we do not think that the case stands for the proposition that any demonstrative aid, such as the one employed in the case at bar, is subject to the rules of discovery.

Relevant to our consideration is the holding in State v. Witherspoon, 681 S.E.2d 348, 351 (N.C. Ct. App. 2009), wherein the defendant, who was married to the deceased victim, a police officer, contended that, as she was standing behind a sofa on which he was sleeping, their cat jumped onto the back of the sofa, causing her to pull the trigger of a pistol she was holding as she was contemplating suicide, the shot striking and killing her husband. The court concluded that the State's in-court use of a mannequin, with wooden dowels in the head to illustrate the path of the bullet, using a different couch than at the crime scene, was not an "experiment" but, instead, a "demonstration" intended to "'illustrate or explain' the physical conditions existing at the time of the shooting, including the position of [the victim's] head and the path and direction of the bullet." Id. at 353. In the present appeal, although the defendant argues that, pursuant to Tennessee Rule of Criminal Procedure 16(a)(1)(G), use of the bed to illustrate the testimony of Dr. Mileusnic-Polchan was an "experiment," entitling him to advance notice, his objection at trial, upon which the judge ruled, was that he had not been given advance notice of the demonstration, that the bed used at trial was thicker than that at the scene, that the knots were tied differently than had been the case at the scene, and that, as we understand, the demonstration could not be accurate unless the noose actually tightened around the neck of the person portraying the victim. By our reading of the trial transcript, the defendant did not raise at trial the Rule 16 argument which he has raised on appeal and, therefore, we may not consider it. See State v. Dooley, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000).[1]

Regardless, we disagree with the defendant's contention that the State's failure to provide prior notice of the demonstration, or that the various differences between the courtroom demonstration and the apparatus in the defendant's home, rendered the medical examiner's use of the demonstrative aid unfairly prejudicial. It is clear from her testimony that the medical examiner used the bed to demonstrate not only that the rope was too short for the victim to hang herself as claimed by the defendant, but also that the system, as reenacted by the defendant, could not have resulted in the type of internal and external hemorrhages and horizontal, unpatterned, ligature mark without a suspension point that she

---

[1]This argument was presented, however, in the motion for new trial.

found on the victim. We conclude, therefore, that the trial court did not abuse its discretion in allowing this demonstration and testimony regarding it.

## II. Exclusion of Rope Found in Defendant's Former Home

The defendant also contends that the trial court erred by excluding evidence of the length of rope found in his former home as a sanction for his violation of the reciprocal discovery rules. He first argues that his failure to disclose the evidence until trial did not constitute a violation of his discovery requirements because the rope was not in his possession, and he had no intention of using it in his case-in-chief until the medical examiner conducted her surprise demonstration. In the alternative, he argues that, even if the discovery rules were violated, the trial court abused its discretion in ordering the severe sanction of complete exclusion of the evidence, which prejudiced his right to a fair trial. The State argues, among other things, that the trial court did not abuse its discretion in excluding the evidence because the defendant knew of the existence of the rope for over four years after the parties' requests for discovery were filed and yet did not disclose it to his counsel or law enforcement officers until the middle of the trial.

The reciprocal discovery rules provide that if the defendant requests disclosure under the rules of discovery and the State complies, "the defendant shall permit the state, on request, to inspect and copy or photograph . . . tangible objects, . . . if: (i) the item is within the defendant's possession, custody, or control; and (ii) the defendant intends to introduce the item as evidence in the defendant's case-in-chief at trial." Tenn. R. Crim. P. 16(b)(1)(A). If a party fails to comply with the rules of discovery, the trial court may, in its discretion, fashion any one of a number of remedies, including exclusion of the evidence. Tenn. R. Crim. P. 16(d)(2)(C). The sanction must fit the circumstances of each case. Sate v. James, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984). "Evidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with discovery and that the prejudice cannot be otherwise eradicated." Id. (citations omitted).

Based on our review of the evidence, we conclude that, even if the defendant's failure to reveal the existence of the rope until the middle of trial did not constitute a discovery violation, and the rope was otherwise admissible under the rules of evidence, its exclusion constituted harmless error. First, we note that the defendant was allowed to testify about how he had altered the rope used by the medical examiner in her demonstration. We also note that the defendant's own statement, in which he described holding the victim down as she fought and kicked to free herself from the alleged hanging device, would be sufficient for the jury to find him guilty of premeditated first degree murder, even if the episode began, as he claimed, as a suicide. Most importantly, we note that the medical examiner was unequivocal in her testimony that the victim's lethal ligature marks were inconsistent with the defendant's

account of an assisted suicide by hanging and instead revealed that the cause of death was a "clear-cut strangulation." Further, as we have set out, before the issue regarding the rope arose, the jury already had learned of the defendant's shifting explanations of the victim's death and of his flight on the eve of trial, subsequent arrest in Los Angeles, and apparent intent to evade capture by changing identities. Given all of this, we cannot envision that the defendant's late revelation of having cut off and hidden a section of the rope would have done anything other than strengthen the State's already strong case. Under such circumstances, any error in excluding the evidence was harmless. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE